**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Macquarie Bank Limited and | ) | |
| Macquarie Americas Corp., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| Bradley D. Knickel; LexMac Energy, L.P.; | ) | |
| Lexar Energy, Inc.; Novus Operating | ) | |
| Company, L.P.; KHL, Inc.; and | ) | |
| Mineral Land Services, Inc., | ) | Case No. 4:08-cv-048 |
| | ) | |
| Defendants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Macquarie Barnett, LLC, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

_____

Before the Court are the Plaintiffs' and Third-Party Defendant's "Motion for Partial

Summary Judgment on Plaintiffs' Breach of Contract Claim and Motion for Summary Judgment on

Defendants' Counter-Claims" and the Defendants' and Counter-Claimants' Motion for Summary

Judgment filed on October 1, 2009.  See Docket Nos. 99 and 104.  The Defendants filed a response

in opposition to the Plaintiffs' and Third-Party Defendant's motion on November 2, 2009.

See Docket No. 112.  The Plaintiffs and Third-Party Defendant filed a response in opposition to the

Defendants' motion on November 3, 2009.  See Docket No. 114.  The parties filed reply briefs on

November 10, 2009 and November 13, 2009.  See Docket Nos. 120 and 124.  Oral argument on the

motions was held in Bismarck, North Dakota on December 18, 2009.  For the reasons set forth

below, the Plaintiffs' and Third-Party Defendant's motion is granted in part and denied in part and

the Defendants' and Counter-Claimants' motion for summary judgment is granted in part and denied in part.

I.    **BACKGROUND**

Plaintiff Macquarie Bank Limited ("MBL") is a bank incorporated under the laws of Australia, with its principal place of business in Sydney, Australia.  Plaintiff Macquarie Americas Corp. ("Macquarie Americas") is a Delaware corporation with its principle place of business in New York.  Defendant KHL, Inc. ("KHL") is a New Mexico corporation with its principle place of business in New Mexico.  Defendant Mineral Land Services, Inc. ("Mineral Land Services") is a North Dakota corporation with its principal place of business in North Dakota.  Defendant Bradley Knickel is in the business of developing oil and gas reserves and is a resident of Texas.  Defendant LexMac Energy, L.P. ("LexMac") is a Nevada limited partnership with its principle place of business in Houston, Texas.  Knickel has a 92-percent limited partnership interest in LexMac.  See Docket No. 57-3, p. 3.  Defendant Novus Operating Company, L.P. ("Novus") is a Nevada limited partnership with its principle place of business in Houston, Texas.  Knickel has a 99-percent limited partnership interest in Novus.  See Docket No. 57-3, p. 3.  Defendant Lexar Energy, Inc. ("Lexar") is a corporation with its principle place of business in Houston, Texas.  Knickel owns 100-percent of Lexar.  See Docket No. 57-3, p. 5.  Third-Party Defendant Macquarie Barnett, LLC ("Macquarie Barnett")  is a Delaware limited liability company.

At some point, LexMac and Novus decided to develop certain oil and gas leases in McKenzie County, North Dakota in what became known as the "Cedar Butte Project."  Most, if not all, of the leases relating to the Cedar Butte Project had originally been owned by Lexar but were transferred

2

to LexMac to secure funding for oil and gas development. <u>See</u> Docket No. 57-3, pp. 61-62. LexMac and Novus needed funding to develop the Cedar Butte Project and, therefore, approached MBL. MBL is based in Australia and does business in the United States specializing in lending money for energy development.

On April 8, 2005, MBL, LexMac, and Novus finalized financing for the Cedar Butte Project. MBL, LexMac, and Novus executed numerous financial documents to secure funding for the project. The "lead agreement" was the "Senior First Lien Secured Credit Agreement" ("Credit Agreement") wherein LexMac and Novus agreed to grant, assign, transfer, and convey to MBL a first priority mortgage lien and perfected security interest in the collateral subject to permitted encumbrances. <u>See</u> Docket No. 26-2, p. 33. The Credit Agreement provided that MBL would lend LexMac and Novus up to $20,000,000 for the project to be advanced in "tranches" for specific uses if certain conditions were met. The Credit Agreement provides for funding in accordance with the following tranches:

> Section 2.2    <u>Availability and Purpose of Advances</u>.  Beginning on the Closing Date and continuing through the applicable Availability Termination Date:
>
> (a)    <u>Tranche A</u>.  Up to two million dollars ($2,000,000.00) of the Term Loan ("<u>Tranche A</u>"), comprised of sub-Tranches A-1 and A-2 described below, may be used by Borrower for the following purposes:
>
> (*i*)    <u>Tranche A-1</u>.  Up to one million dollars ($1,000,000.00) of Tranche A ("<u>Tranche A-1</u>") may be used by Borrower exclusively for the purposes of paying:
>
> (A)    dry hole costs associated with the drilling of the Ann #1 Well and incurred by Borrower pursuant to an AFE approved in writing by Lender in its sole and absolute discretion; and

(B)     other fees and expenses incurred by Borrower in connection with the transactions contemplated by this Agreement, but only to the extent (1) those fees and expenses are included on Schedule 2.2(a)(*i*)(B) and (2) the payment of those fees and expenses does not result in insufficient availability remaining under Tranche A-1 to pay the drilling costs contemplated by Section 2.2(a)(*i*)(A) above.

(*ii*)    Tranche A-2.  Up to one million dollars ($1,000,000.00) of Tranche A ("Tranche A-2") may be used by Borrower exclusively for the purposes of paying completion costs associated with the Ann #1 Well and incurred by Borrower pursuant to an AFE approved in writing by Lender in its sole and absolute discretion.

(*iii*)    Tranche A Generally.  Notwithstanding the other terms and conditions of this Agreement, (A) Lender will have no obligation to make any Advance under Tranche A-1 unless and until Lender is satisfied, in its sole and absolute discretion, with its due diligence review of the Properties, and (B) Lender will have no obligation to make any Advance under Tranche A-2 unless and until Lender is satisfied, in its sole and absolute discretion, with the results of all drilling activities related to the Ann #1 Well and the geological and other technical information generated or acquired as a result of those activities.  Additionally, to the extent the full amount of funds available for Tranche A are not needed for the purposes set out above, such funds shall not be available for any other purpose or under any other Tranche.

(b)    Tranche B.  Up to four million eight hundred sixty-five thousand dollars ($4,865,000.00) of the Term Loan ("Tranche B") may be used by Borrower exclusively for the following purposes:

(*i*)    (A)    up to sixty-five thousand dollars ($65,000) of Tranche B may be used for the acquisition of seismic [data] associated with the Cedar Butte Properties;

(B)    up to four million eight hundred thousand dollars ($4,800,000.00) of Tranche B may be used to pay costs incurred by Borrower pursuant to an AFE approved in writing by Lender in its sole and absolute

4

discretion in connection with [] drilling and completing two additional wells on the Cedar Butte Properties; and

(C)    to pay the Advance Fee associated with each Advance (if any) made under Tranche B.

(*ii*)    <u>Tranche B Generally</u>.  Notwithstanding the other terms and conditions of this Agreement, Lender will have no obligation to make any Advance under Tranche B unless and until Borrower prepares and Lender approves in writing, in its sole and absolute discretion, a revised Development Plan. Borrower agrees and acknowledges that Lender has no obligation, express or implied, to approve a revised Development Plan for the use of any proceeds under Tranche B.  Additionally, to the extent the full amount of funds available for Tranche B are not needed for the purposes set out above, such funds shall not be available for any other purpose or under any other tranche.

(c)    <u>Tranche C</u>.  Up to thirteen million one hundred thirty-five thousand dollars ($13,135,000) of the Term Loan ("<u>Tranche C</u>") may be used by the Borrower for the purpose of funding the acquisition and development of additional Properties pursuant to a revised Development Plan prepared by Borrower and approved in writing by Lender in its sole and absolute discretion.  Notwithstanding the approval of a revised Development Plan, however, Lender has no obligation to make any Advance under Tranche C unless the results of development activities contemplated in that revised Development Plan for which Tranche B funds are utilized are satisfactory to Lender in its sole and absolute discretion.   Borrower agrees and acknowledges that Lender has no obligation, express or implied, to approve a revised Development Plan for the use of any proceeds under Tranche C.

<u>See</u> Docket No. 26-2, pp. 24-26.

In accordance with the terms of the Credit Agreement, LexMac and Novus executed a "Term Note" in the amount of $20,000,000, along with a "Mortgage, Assignment of Production, Security Agreement and Financing Statement" ("Mortgage and Security Agreement") which provided that the borrowers (LexMac and Novus) pledged as collateral a continuing security interest in, among

5

other things, the leases that had been previously assigned by Lexar to LexMac for the Cedar Butte

Project.  The Mortgage and Security Agreement was amended two additional times, once on January

13, 2006 and also on June 1, 2006.  The purpose of the amendments was to revise the listing of the

collateral leases.

The Mortgage and Security Agreement also required LexMac and Novus to execute a "Net

Profits Overriding Royalty Interest Conveyance" ("NPORIC").  Pursuant to the NPORIC, LexMac

and Novus granted to Macquarie Americas a 40-percent "net profits" royalty interest from any

production of the collateral leases.  See Docket No. 101-12.  Macquarie Americas is a wholly-owned

subsidiary of MBL.  The NPORIC continues even after the debt to MBL is satisfied:

> FOR AND IN CONSIDERATION OF THE SUM OF ONE HUNDRED
> DOLLARS ($100.00) and other good and valuable consideration, the receipt,
> adequacy and sufficiency of which are hereby acknowledged, Assignor by these
> presents does hereby GRANT, CONVEY, ASSIGN and TRANSFER to Assignee the
> Net Profits Overriding Royalty Interest (defined below) in and to the Subject Interests
> (defined below).
>
> TO HAVE AND TO HOLD the Net Profits Overriding Royalty Interest,
> together with all and singular the other rights, titles, interests, estates, remedies,
> powers, privileges and appurtenances thereto, unto Assignee, its successors and
> assigns, forever subject, however, to the terms and provisions of this Conveyance.
> Assignor hereby binds itself, its successors and assigns, to WARRANT and
> FOREVER DEFEND all and singular the Net Profits Overriding Royalty Interest
> unto Assignee, its successors and assigns, subject only to the Permitted
> Encumbrances, against every Person whomsoever lawfully claiming or to claim the
> same or any part thereof.  The Net Profits Overriding Royalty Interest is not a
> contingent interest but is a fully and presently vested real property interest.

See Docket No. 101-12, p. 1. This provision in the NPORIC gave MBL an indirect interest in the

success of the Cedar Butte Project and created a relationship between MBL and the borrowers that

was more than a traditional lender-borrower relationship.  Neither Bradley Knickel nor Lexar was

a party to any of the lending agreements.

6

Shortly after the agreements were executed, LexMac and Novus ran into problems securing a drilling rig which put the entire project behind schedule, and increased the costs of developing the leases for production. Eventually, a drilling rig was obtained and the first and only well, the Ann #1 Well, was completed. LexMac and Novus ran into additional problems in attempting to develop the Ann #1 Well which ultimately halted its production.

The record reveals that costs ran higher than expected and LexMac and Novus owed more than $1,000,000 to the third-party vendors. See Docket No. 59-5, pp. 10, 24. MBL refused to fund payment to the vendors. MBL's Sydney, Australia office ultimately made the decision to stop all funding on the development of the Cedar Butte Project and, as a result, drilling operations on the Ann #1 Well ceased. See Docket No. 59-5, p. 10. On July 31, 2007, MBL issued a "Notice of Default and Notice of Intent to Accelerate." See Docket No. 26-5.

In September 2007, MBL was aware of when LexMac's leases would expire. See Docket No. 52-2, pp. 46-47. Discussions with Knickel allegedly began soon thereafter regarding the expiring leases.

On October 16, 2007, Brent Poe, a landman working for Greenburg Taurig, LLP, the law firm handling the banks' legal affairs, sent an email to its brokers to cease efforts in extending the expiring acreage:

> [T]his communication serves as formal notice that Diamond Resources should cease its efforts to renew and/or extend those expiring leases that LexMac has pledged as collateral in its financial transaction with Macquarie Bank Limited. Ray Weems has made the business decision to allow Brad Knickel, through my interaction with LexMac, to renew and extend the leases that were previously identified with you as requiring negotiation to renew and/or extend. It is Brad Knickel's desire to acquire these rights on behalf of Macquarie Barnett, LLC.
>
> Should you be contacted by any of the land owners or Lessors of these particular tracts regarding your earlier proposals to acquire a lease, please advise them that your

client Macquarie Barnett does not intend to renew these leases in their own name at
this time.

See Docket No. 115-2.

On October 18, 2007, Raymond Weems, the executive director of MBL in the Houston,

Texas office, sent the following email to Knickel to allegedly confirm the discussions they had

regarding the expiring leases:

> I am copying you on this e-mail to confirm your assurance to us that you/Lexmac will
> immediately endeavor to re-lease all expired and expiring acreage that has served as
> collateral for Lexmac's obligation to Macquarie Bank.  That assurance you gave to
> us is the reason we instructed our lease brokers to step down.  I expect Brent Poe to
> constantly monitor the situation and speak with you several times a week in an effort
> to get all relevant acreage re-leased and immediately assigned to us.  We will fund
> the acreage cost.

See Docket No. 115-2.

MBL filed a complaint, dated October 22, 2007,  in McKenzie County District Court against

LexMac, Novus, and Lexar, among others, to foreclose on LexMac's and Novus's rights, title, and

interest in real property pursuant to the following leases that were pledged as collateral:

| NAME | RECORDING REFERENCE | EXPIRATION DATE |
|------|---------------------|-----------------|
| North Dakota State Leases (Four total) | 386662<br>386663<br>386664<br>386665 | 05/09/2011 |
| "Hystad" | 341829<br>361982 | 02/19/2008 |
| "Lawrence" | 341254<br>361322 | 01/25/2008 |
| "Ceynar" | 341253<br>361323 | 01/24/2008 |

8

| "Anderson" | 341252<br>359734 | 11/21/2007 |
| "Patterson 1" | 335764<br>343205<br>365138 | 08/31/2007 |
| "Patterson 2" | 353065 | 10/06/2006 |
| "Sevigny 1" | 335765<br>343204<br>358622<br>365139 | 08/31/2007 |
| "Sevigny 2" | 353066 | 10/11/2006 |
| "Steele-Gruman" | 348328<br>362329 | 04/12/2008 |
| "MacMaster" | 341251<br>366644 | 11/16/2007 |
| "Berg" | 355469 | 11/08/2007 |
| "Burr" | 355464 | 12/13/2007 |
| "Lewis Sisters" | 355471 | 10/21/2007 |
| "Crone" | 355470 | 02/23/2008 |
| "Chisholm" | 357949 | 03/04/2008 |

See Docket Nos. 26-6 and 105.  Many of these leases have now expired by their own terms because of a lack of drilling and LexMac's interest has expired along with it, namely the Patterson 2 and Sevigny 2 leases expired in October 2006; the Patterson 1 and Sevigny 1 leases expired in August 2007; the Lewis Sisters lease expired in October 2007; the Anderson, MacMaster, and Berg leases expired in November 2007; the Burr lease expired in December 2007; the Lawrence and Ceynar leases expired in January 2008; the Hystad and Crone leases expired in February 2008; the Chisholm lease expired in March 2008; and the Steele-Gruman leases expired in April 2008.

9

By February 2008, MBL knew that many of the above-identified leases had expired.  See Docket No. 59-6, p. 30.  Some of the leases contained extension provisions which allowed the leases to be extended on their own terms.  See Docket No. 59-5, p. 12.  LexMac took steps to renew the leases with extension provisions, and Lexar began entering into new leases with the landowners on the expiring leases without extension provisions.  Employees of MBL sent Knickel several emails regarding their concerns relating to the expiring leases.

On February 12, 2008, Raymond Weems sent Bradley Knickel an email, providing, in part:

> As I mentioned on the phone last week, we are extremely concerned about the acreage situation and a possible diminution in our collateral.  As you will recall, last year when we first brought up our concerns about acreage expirations and suggested we could send out a team of local landmen to release the acreage on behalf of Macquarie (in anticipation of a foreclosure event), you suggested that would be inappropriate as this was Lexmac's responsibility and might send "mixed signals" to landowners.  We therefore shut down the lease brokers we had reviewing the matter, as Lexmac requested, in order for Lexmac to re-lease the acreage in an effort to [preserve] our collateral.  I'm sure you can therefore appreciate my concerns when I recently phoned John McMaster (see attached McMaster letter) concerning his letter in Dec., only to be informed that the lease was no longer available and was being assigned to someone else???  Did your brokers obtain the lease and what about the other acreage that has expired?  As we mentioned last Fall, Macquarie would gladly fund for Lexmac the bonus requirement for re-leasing acreage that secures our loan, but we have no idea as to what the current status really is ???  We look forward to a frank discussion tomorrow.  Thank you.

See Docket No. 26-9.

On February 13, 2008, the McKenzie County District Court entered a judgment in the foreclosure action, declaring that all of LexMac's and Novus's rights in the nineteen leases shall be sold by the sheriff of McKenzie County, and finding that MBL was entitled to a judgment in the amount of $5,296,252.29, plus interest accruing from and after October 18, 2007, against LexMac and Novus.  See Docket No. 26-7.

On February 15, 2008, following a meeting with Bradley Knickel, Raymond Weems sent

Knickel the following email:

> Thanks very much for stopping by earlier this week and bringing us up to date on
> your acreage renewal activities with regard to our collateral.  I was particularly
> pleased to hear that the McMaster lease has been secured through your brokers, as
> well as others to follow.  It is timely because we just learned today that Macquarie
> has finally been given judicial clearance to foreclose, which should technically occur
> in about five weeks.  I understand, however, that these lease renewals are being
> secured in the name of "Lexar" and not "Lexmac".  Could you please, therefore, have
> those leases assigned to Lexmac as soon as possible, but in any case well before the
> final foreclosure date.  I have asked Bill and Brent Poe to coordinate this with you on
> almost a "real-time" basis and truly hope that all of the acreage which has expired can
> be re-instated quickly.  As you know, we will immediately fund payment to you of
> the lease bonus pymts. you have incurred, and please let us know if you are incurring
> any problems with regard to the renewals.

See Docket No. 26-10.  Knickel testified that he did not respond to this email in writing.  See Docket

No. 57-3, pp. 65-66.  Knickel denies ever informing MBL or its representatives that he intended to

renew all of the leases that would expire before the foreclosure sale, and contends that he expressly

made representations to MBL representatives that he would only renew the leases with extension

provisions.  See Docket No. 57-3, pp. 56-57.

On February 22, 2008, Weems again emailed Knickel expressing concerns as to the "exact

status (broker involved, bonus pymts. due, recordings, net revenue interests, nature of royalties, etc.)"

of each lease.  See Docket No. 26-11.  On February 28, 2008, Bill Jentsch, the associate director of

MBL, emailed Knickel to verify that the "3000+ 'at-risk' acres" [would be] re-leased, reconveyed

and recorded."  See Docket No. 26-12.  Knickel did not send Weems or Jentsch an email in response

to indicate that he would only renew the leases with extension provisions.  Nonetheless, Knickel

asserts that he made numerous representations in person and over the phone expressing this intention,

11

and that he provided spreadsheets of lease schedules to MBL to clarify the status of each lease.

See Docket No. 57-3, pp. 60-62.

> On April 3, 2008, Knickel notified MBL in writing of this intention, stating:
>
> As we have discussed in the past, LexMac has and will take all action necessary to effectuate an extension of those leases that had a provision for extension and have not yet expired to assist in the preservation of the collateral of Macquarie. I believe that LexMac has taken such action. As to those leases that expired and new leases have been entered into, I disagree that I have any obligation to assign these leases to Macquarie. I am not aware of any provision in the agreement between LexMac and Macquarie which would require such an assignment. Please let me know if, in your opinion, such a provision does exist.

See Docket No. 57-5. MBL ultimately spent the sum of $500,000 to acquire an additional 1,600 acres surrounding the acreage that Lexar had acquired. See Docket No. 103-1, p. 30.

On April 7, 2008, a sheriff's sale was held at the McKenzie County Courthouse and Macquarie Barnett, a wholly-owned subsidiary of MBL, purchased LexMac's and Novus's rights, title, and interest in the original collateral, for the sum of $5,400,000. See Docket No. 101-6. Macquarie Barnett was fully aware when it placed this bid that LexMac's and Novus's interest had already expired in a majority of the leases that formed the original collateral.

MBL filed a "Notice of Lis Pendens," dated May 27, 2008, with the McKenzie County Recorder providing, "[t]he action involves the title to and/or seeks to enforce a lien, charge or encumbrance against Lexar Energy, Inc.'s interest, as lessee" in a number of the leases owned by Lexar. See Docket No. 75-1. Thereafter, Macquarie Barnett "top leased"[1] Lexar's acreage. MBL filed an "Amended Notice of Lis Pendens," dated August 21, 2008, but failed to include the reference

---

[1] The term "top lease" is defined as "'[a] lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated.'" Nantt v. Puckett Energy Co., 382 N.W.2d 655, 657 n.1 (N.D. 1986) (quoting Norman Jessen & Assocs. v. Amoco Prod. Co., 305 N.W.2d 648, 649 n.2 (N.D. 1981)).

numbers associated with Lexar's ownership of the leases and instead included the reference numbers of the expired leases.  <u>See</u> Docket No. 75-2.

The parties have each filed motions for summary judgment.  The Plaintiffs and Third-Party Defendant seek:  (1) summary judgment on the liability element of its breach of contract claim; and (2) the dismissal of the Defendants' counterclaims.  The Plaintiffs contend that there are five or six leases which Lexar currently owns that should have been placed in LexMac's name during foreclosure, and they seek a net profits overriding royalty interest in those leases.  <u>See</u> Docket No. 68, p. 11.  The Defendants contend that they are entitled to summary judgment on (1) all of the Plaintiffs' claims against them, (2) their claims for declaratory relief, and (3) their request to quiet title and remove the lis pendens.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  <u>Davison v. City of Minneapolis, Minn.</u>, 490 F.3d 648, 654 (8th Cir. 2007); <u>see</u> Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  <u>Diesel Mach., Inc. v. B.R. Lee Indus., Inc.</u>, 418 F.3d 820, 832 (8th Cir. 2005).

The moving party bears the burden of demonstrating an absence of a genuine issue of material fact. Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).


## III.   LEGAL DISCUSSION

### A.   PLAINTIFFS' AND THIRD-PARTY DEFENDANT'S SUMMARY JUDGMENT MOTION

The Plaintiffs and Third-Party Defendant seek summary judgment on their claim for breach of contract of the Net Profits Overriding Royalty Interest Conveyance and on all of the Defendants' counterclaims.  LexMac, Novus, and Lexar have filed the following counterclaims:  (1) a declaratory judgment action; (2) an action to quiet title and remove the lis pendens; (3) misappropriation and misuse of confidential and proprietary information; (4) tortious interference; (5) alter ego; (6) conspiracy; (7) breach of the duty of good faith and fair dealing; and (8) unfair lending practices and lender liability.


### 1)   BREACH OF CONTRACT OF THE NET PROFITS OVERRIDING ROYALTY INTEREST CONVEYANCE

LexMac and Novus entered into a Net Profits Overriding Royalty Interest Conveyance wherein it and its "successors and assigns" agreed to give Macquarie Americas a 40-percent net profits overriding royalty interest.  See Docket No. 101-12, p. 1.   In Section 4.3 of the NPORIC, under the heading "Surrender or Termination," LexMac and Novus agreed that, without Macquarie Americas' written consent,

it will neither terminate any of the Leases nor surrender or release any of the lands covered thereby except (a) in connection with the abandonment of a well in compliance with <u>Section 4.2</u> above, or (b) any undeveloped lands or any Lease covering only undeveloped lands which may be surrendered, released or terminated so long as no Affiliate or Assignor shall acquire an interest in such lands within one (1) year after the release or surrender thereof (whether voluntarily or involuntarily). <u>The expiration of a Lease in accordance with its terms (other than by termination, surrender or release by Assignor) shall not be considered to be a voluntary surrender or abandonment thereof; provided, however, Assignor shall have an obligation to give Assignee written notice of any Lease which will expire or terminate ninety (90) days prior to the expiration or termination of such Lease.</u> If Assignor or any Affiliate of Assignor re-leases or re-lets the lands covered by a <u>lapsed, terminated or released</u> Lease within one (1) year from the lapse, termination or release of the Lease, such renewal or new lease shall become subject to the terms of this Conveyance.

<u>See</u> Docket No. 101-12, p. 11 (emphasis added).  The NPORIC is governed by the laws of the State of North Dakota.[2]  <u>See</u> Docket No. 101-12, p. 18.

The interpretation of a contract is a question of law.  <u>Lire, Inc. v. Bob's Pizza Inn Rests., Inc.</u>, 541 N.W.2d 432, 433 (N.D. 1995).  It is the goal of courts when interpreting contracts to give effect to the mutual intent of the parties as it existed at the time of contracting.  <u>ACUITY v. Burd & Smith Constr., Inc.</u>, 721 N.W.2d 33, 36 (N.D. 2006) (citing <u>State v. N.D. State Univ.</u>, 694 N.W.2d 225, 229 (N.D. 2005)).  "The parties' intent must be ascertained from the entire instrument, and every clause, sentence, and provision should be given effect consistent with the main purpose of the contract." <u>U.S. Bank, Nat'l Ass'n v. Koenig</u>, 650 N.W.2d 820, 823 (N.D. 2002).  Pursuant to N.D.C.C. § 9-07-04, the court must construe the intention of the parties from the written contract alone, if possible. Unambiguous language must be given its clear meaning.  <u>Kief Farmers Coop. Elevator Co. v. Farmland Mut. Ins. Co.</u>, 534 N.W.2d 28, 32 (N.D. 1995).  "'A contract is ambiguous when rational arguments can be made for different interpretations.'"  <u>Spagnolia v. Monasky</u>, 660 N.W.2d 223, 227

---

[2] Section 10.12 of the NPORIC provides:  "THIS CONVEYANCE SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NORTH DAKOTA EXCEPT TO THE EXTENT THE LAWS OF ANOTHER JURISDICTION ARE MANDATORILY APPLICABLE."

(N.D. 2003) (quoting Gawryluk v. Poynter, 654 N.W.2d 400, 404 (N.D. 2002)).  When a contract is ambiguous, extrinsic evidence may be considered in determining the parties' intent.  Whether a contract is ambiguous is a question of law.  Kerzman v. N.D. Workers Comp. Bureau, 590 N.W.2d 888, 892 (N.D. 1999).  When there is ambiguity in a contract, the maker of the contract bears the responsibility for the ambiguity and the contract must be construed in the light most favorable to the other party.  Minette v. Associated Chinchilla Breeders, Inc., 173 N.W.2d 485, 493-94 (N.D. 1970).

The Court finds that Section 4.3 of the NPORIC is ambiguous in that it is unclear if the "expiration" of a lease is distinct from the "termination" or "lapse" of the lease.  The confusion is caused by two sentences in Section 4.3, wherein it states,

> The expiration of a Lease in accordance with its terms (other than by termination, surrender or release by Assignor) shall not be considered to be a voluntary surrender or abandonment thereof; provided, however, Assignor shall have an obligation to give Assignee written notice of any Lease which will expire or terminate ninety (90) days prior to the expiration or termination of such Lease.  If Assignor or any Affiliate of Assignor re-leases or re-lets the lands covered by a lapsed, terminated or released Lease within one (1) year from the lapse, termination or release of the Lease, such renewal or new lease shall become subject to the terms of this Conveyance.

See Docket No. 101-12, p. 11 (emphasis in original).  In accordance with North Dakota law, the Court will construe the ambiguity against the maker of the contract, Macquarie Americas, and in favor of LexMac and Novus.

The first sentence reads as follows:  "The expiration of a Lease in accordance with its terms (other than by termination, surrender or release by Assignor) shall not be considered to be a voluntary surrender or abandonment thereof; provided, however, Assignor shall have an obligation to give Assignee written notice of any Lease which will expire or terminate ninety (90) days prior to the expiration or termination of such Lease."  See Docket No. 101-12, p. 11 (emphasis in original). The sentence is confusing because it references expired leases, in an attempt to distinguish expired

16

leases from terminated, surrendered, or released leases, but provides that the lease will not be considered a voluntary surrender or abandonment provided that notice is given as to the "expiration" or "termination" of the lease.  Therefore, in the latter part of the sentence, terminated and expired leases are grouped together.  The NPORIC does not define the terms "expire," "terminate," "surrender," or "release."

In Fuller v. Phillips Petrol. Co., 872 F.2d 655, 659-60 (5th Cir. 1989) (emphasis added), the Fifth Circuit Court of Appeals defined "surrender" as:

> In the oil and gas industry, the term "surrender" refers to the contractual right of a lessee to voluntarily relinquish to the lessor all or part of the leased premises, thereby allowing the lessee to retain the most profitable portion of a lease while at the same time releasing the least profitable portion of the lease.  8 Williams & Meyers, Oil and Gas Law § 966 (1985).  Moreover, while a lease may be terminated by the act of one party by surrendering its rights under the lease, such a surrender may only occur while the lease is in effect.

The Oxford English Dictionary defines "release" as "[t]o withdraw, recall, revoke, cancel."  13 Oxford English Dictionary 558 (2d ed. 2001).

"Termination," on the other hand, is the result of either a voluntary act or of the expiration of a lease's primary term.  "'A lease may be terminated by a lessee by the exercise of a surrender clause in the lease, and under contemporary forms of leases, failure of production in paying quantities at or after expiration of the primary term will cause the lease to be terminated unless it can be preserved by some savings clause in the lease . . . .'"  Sun Operating Ltd. P'ship v. Murphy Oil Corp., 1999 WL 423044, at *4 n.15 (5th Cir. June 1, 1999) (unpublished) (quoting Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms 597 (4th ed. 1976)).  "In the absence of production of oil or gas, the termination of such a lease occurs automatically upon the expiration of the primary term, without the necessity of any action by either party to the lease." Energetics, Ltd.

v. Whitmill, 497 N.W.2d 497, 502 n.16 (Mich. 1993) (citing J.J. Fagan & Co. v. Burns, 226 N.W.

653, 655 (Mich. 1929); McCullough Oil, Inc. v. Rezek, 346 S.E.2d 788, 794 (W. Va. 1986)).

        The second sentence at issue in Section 4.3 reads as follows:  "If Assignor or any Affiliate

of Assignor re-leases or re-lets the lands covered by a lapsed, terminated or released Lease within

one (1) year from the lapse, termination or release of the Lease, such renewal or new lease shall

become subject to the terms of this Conveyance."  See Docket No. 101-12, p. 11.  The NPORIC does

not define "lapse."  It is unclear from the language of Section 4.3 whether the parties intended an

expired lease to be synonymous with a lapsed lease.  The Oxford English Dictionary defines "lapse"

as "[t]o fall away by slow degrees; to pass or sink gradually through absence of effort or sustaining

influence."  8 Oxford English Dictionary 652 (2d ed. 2001).  In other words, a lapsed lease is a lease

which is allowed to let slip by way of time or a term in the lease.

        In construing the ambiguity against the maker of the contract, Macquarie Americas, the Court

finds that Section 4.3 was intended to prevent the Assignors, LexMac and Novus, from voluntarily

acting in some way so as to release itself of the duties under the NPORIC and then having its

affiliates, successors, or assigns re-lease the original collateral.  The record reveals that LexMac and

Novus defaulted on the loans due to events not entirely under their control, including the delay in

obtaining a drilling rig in North Dakota.

        At some point in 2007, MBL ceased funding the operations of the Cedar Butte Project and

sent LexMac and Novus a "Notice of Default and Notice of Intent to Accelerate."  See Docket No.

26-5.  Each lease provided by LexMac and Novus as collateral for the loans contained a date on

which the lease would expire if drilling operations ceased.  Drilling operations ceased when MBL

stopped funding the project as a result of the default.  The leases ultimately expired on the date

18

established in the leases or on the date drilling operations ceased, whichever was later.  The record

is devoid of any evidence that LexMac or Novus voluntarily terminated the leases by their own

actions, surrendered or released the leases prior to their expiration, or allowed the leases to lapse.

The leases expired according to their own terms as a result of MBL finding the loan in default and

ceasing any additional funding under the Credit Agreement.

More important, under Section 4.3, the expiration of the leases is not considered to be a

voluntary surrender if Knickel provided MBL ninety days' notice of the expiration dates.  Knickel

testified that he provided MBL a lease schedule which indicated the expiration dates of the collateral

leases prior to the ninety-day deadline:

| | |
|---|---|
| Q. [Counsel for the Plaintiffs]: | Did you provide – did you provide that 90 days notice to Macquarie for the leases that expired? |
| A. [Bradley Knickel]: | I – I believe so. |
| Q. [Counsel for the Plaintiffs]: | Okay.  Do you have any proof of that? |
| A. [Bradley Knickel]: | I think some of the lease schedules that – that I provided – I mean, I'm just going from memory here and have to – have to point to them, but those lease schedules – there was one sent back in early – early 2007, and it has expiration dates on that lease schedule. |
| Q. [Counsel for the Plaintiffs]: | And you think that that's sufficient to be written notice of any lease which will expire or terminate 90 days prior to the expiration? |
| A. [Bradley Knickel]: | Yes, in my opinion. |

See Docket No. 57-3, pp. 48-49.

On July 31, 2007, MBL filed a notice of default and sometime thereafter discontinued

funding the drilling operations of the Cedar Butte Project.  None of the leases had expired on their

terms or otherwise prior to July 31, 2007.  <u>See</u> Docket No. 26-5.  The earliest leases that were set to expire on their terms were Patterson 2 and Sevigny 2 in October 2006, but the continued drilling operations on the Ann #1 Well extended the duration of the leases.  Therefore, the Patterson 2 and Sevigny 2 leases expired when the drilling operations ceased, sometime after July 31, 2007.  LexMac and Novus provided lease schedules to MBL in "early 2007."  <u>See</u> Docket No. 57-3, pp. 48-49.  The Court has not been provided with the actual date the lease schedules were provided to MBL and, therefore, is unable to determine whether the ninety days' notice was provided.  Pursuant to Section 4.3, the alleged failure of LexMac and Novus to provide ninety days' notice results in the expiration of the leases being treated as a voluntary action under the NPORIC.

"If Assignor or any Affiliate of Assignor re-leases or re-lets the lands covered by a lapsed, terminated or released Lease within one (1) year from the lapse, termination or release of the Lease, such renewal or new lease shall become subject to the terms of this Conveyance."  <u>See</u> Docket No. 101-12, p. 11.  Lexar is an affiliate of LexMac and Novus.[3]  The evidence establishes that Lexar entered into new leases on the acreage that formed the original collateral within one year after the original leases expired and, therefore, Lexar's leases are subject to the terms of the NPORIC.

Nonetheless, Section 4.1 of the NPORIC provides, in relevant part:

No obligations, either express or implied shall arise by reason of this Conveyance, which shall obligate Assignor to keep and maintain the Leases in force and effect either by the payment of rentals, compensatory royalties or other payments or by the drilling of any wells upon the lands with respect to which the Net Profits Overriding Royalty Interest in the Leases is herein assigned, it being expressly understood that

---

[3]  The term "Affiliates" under the NPORIC is defined, in relevant part, as "for any Person . . . , any other Person who directly or indirectly controls, is under common control with, or is controlled by such Person." <u>See</u> Docket No. 101-12, p. 1.  LexMac, Novus, and Lexar are under the common control of Bradley Knickel, with Knickel owning a 92-percent limited partnership interest in LexMac, a 99-percent limited partnership interest in Novus, and a 100-percent interest in Lexar.

> Assignee is to receive said Net Profits in such production only out of the Minerals, if, as and when produced and saved under the terms and provisions of the Leases.

See Docket No. 101-12, pp. 10-11.  Thus, it is clear that Macquarie Americas' interest in the net profits was conditional, arising only when production ensued and net profits were generated.  See also Davis v. Cities Serv. Oil Co., 338 F.2d 70, 74 (10th Cir. 1964) (stating that an agreement to pay a net profits overriding royalty interest "arises only when, and if, the assignee obtains production from the leasehold in paying quantities.").  It is undisputed that Lexar's leases have not been developed and, therefore, there are no net profits on the leases.  Accordingly, Macquarie Americas has not suffered any damages.[4]  Summary judgment is granted in favor of the Defendants and Counter-Claimants on the breach of contract claim.


### 2)    DEFENDANTS' COUNTERCLAIMS

LexMac, Novus, and Lexar have filed numerous claims against the Plaintiffs and Third-Party Defendant:  (1) a declaratory judgment action; (2) an action to quiet title and remove the lis pendens; (3) misappropriation and misuse of confidential and proprietary information; (4) tortious interference; (5) alter ego; (6) conspiracy; (7) breach of the duty of good faith and fair dealing; and (8) unfair lending practices and lender liability.

---

[4]  In a breach of contract claim, the plaintiff bears the burden of proving "(1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach."  United States v. Basin Elec. Power Coop., 248 F.3d 781, 810 (8th Cir. 2001) (applying North Dakota law).

a)    **DECLARATORY JUDGMENT**

LexMac and Novus have filed a declaratory judgment action pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, seeking a declaration that "they [had] no duty to obtain new leases when the leases expire[d] according to their own terms." See Docket No. 75. The Plaintiffs and Third-Party Defendant contend that there is no reason for the Court to declare the parties' rights under the loan documents because the foreclosure procedures ended any ongoing lending relationship between the parties.

Pursuant to 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ." "[A]n actual controversy is 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Diagnostic Unit Inmate Council v. Films Inc., 88 F.3d 651, 653 (8th Cir. 1996) (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)).

In the Plaintiffs' second amended complaint, they cite to the loan documents in an attempt to establish that LexMac and Novus had a duty to maintain the oil and gas leases. See Docket No. 78, ¶¶ 15-21. The Plaintiffs have maintained a position that the "Defendants have wrongfully exercised control over" the expired leases. See Docket No. 78, ¶ 52. In a March 3, 2009 telephonic conference with the Court, the Plaintiffs expressed that LexMac and Novus had a contractual duty to obtain new leases on the expired leases:

| Q. [The Court]: | So the theory of your case essentially is that, what, Mr. Knickel became some sort of a leasing agent for the bank to protect its collateral? |
|---|---|

A. [Counsel for the Plaintiffs]:  No, he's a debtor in possession of these leases, and under the relevant – all of the relevant loan agreements – there's probably four or five – he had certain duties, which were clearly spelled out in our Complaint, that he didn't comply with.

. . .

Q. [The Court]:  Are you saying that the promise comes from the contractual arrangements, or are you saying that the promise comes from some independent conversations where, in effect, this debtor became a leasing agent for the bank's collateral?

A. [Counsel for the Plaintiffs]:  I think both, Your Honor.

See Docket No. 68, pp. 14-15.  The Court finds that there is an actual dispute as to whether there was a contractual duty under the loan documents for LexMac and Novus to renew the expiring acreage. Thus, the Court will consider whether the loan documents provided such a duty.

The Plaintiffs rely on specific provisions of the Credit Agreement and Mortgage and Security Agreement in support of their position.  The Credit Agreement is governed by the laws of Texas.[5] See Docket No. 26-3, p. 39.  The Mortgage and Security Agreement is governed by the laws of North Dakota.[6] See Docket No. 26-4, p. 30.

---

[5] Section 12.8 of the Credit Agreement provides, in relevant part:

EXCEPT TO THE EXTENT THAT THE LAWS OF ANOTHER JURISDICTION ARE MANDATORILY APPLICABLE, THIS AGREEMENT, THE TERM NOTE AND ALL OF THE OTHER LOAN DOCUMENTS . . . TOGETHER WITH ALL TRANSACTIONS PROVIDED FOR IN THEM WILL BE GOVERNED BY, INTERPRETED AND CONSTRUED UNDER AND ENFORCED PURSUANT TO THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO ITS CONFLICT OF LAWS PROVISIONS.

[6] Section 9.12 of the Mortgage and Security Agreement provides:

This Mortgage shall be governed by and construed and interpreted under the laws of the State of North Dakota (without giving effect to conflicts of laws principles), except to the extent that the laws of another State, whether where the Mortgaged Properties are located or otherwise, shall be mandatorily applicable.

23

Under the laws of both North Dakota and Texas, the terms to a contract are given their plain and ordinary meaning unless the parties used them in a different or technical sense within the contract.  City of Bismarck v. Mariner Constr., Inc., 714 N.W.2d 484, 491, 492 (N.D. 2006); Zurich Am. Ins. Co. v. Hunt Petrol. (AEC), Inc., 157 S.W.3d 462, 465 (Tex. App. 2004).  If the contract is unambiguous, then it should be construed as a matter of law.  City of Bismarck, 714 N.W.2d at 491; Zurich Am. Ins. Co., 157 S.W.3d at 465.

The Plaintiffs cite to Sections 6.3(f) and 7.4(c) of the Credit Agreement in support of their proposition that LexMac and Novus were under a duty to renew the expiring leases.[7]  See Docket No. 78.  Section 6.3(f) provides that LexMac and Novus will

> promptly (*i*) pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses, severance taxes and other taxes and indebtedness accruing under the leases or other agreements affecting or pertaining to its Properties, (*ii*) perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Properties and (*iii*) will use commercially reasonable efforts to cause the Operator to do all other things necessary to keep unimpaired, except for Liens described in Section 7.5, its rights with respect to its Properties and prevent any forfeiture thereof or a default thereunder, except to the extent a portion of such Properties is no longer capable of producing in paying quantities.

---

[7] "Lease" or "Leases" under the Credit Agreement is defined as follows:

one or more, (*i*) those certain oil and gas leases set forth in the descriptions of the Properties attached as Exhibit A hereto, and any other interests in the Leases or any other lease of real property, whether now owned or hereafter acquired by Borrower, and any extension, renewals, corrections, modifications, elections or amendments (such as those relating to unitization) of any such Lease or Leases, or (*ii*) other oil, gas and/or mineral leases or other interests pertaining to the Properties, whether now owned or later acquired, which may now and hereafter be made subject to the lien of any of the Security Documents and any extension, renewals, corrections, modifications, elections or amendments (such as those relating to unitization) of any such lease or leases.

See Docket No. 26-2, p. 16 (emphasis in original).

See Docket No. 26-3, p. 8 (emphasis added).  Section 6.3(f) does not mention expiring leases nor does it mention an obligation concerning expiring leases.  Section 6.3(f) only pertains to existing encumbering leases with taxes or liens.

In Section 7.4(c) of the Credit Agreement, LexMac and Novus agree not to "sell, transfer, assign or grant any Person an option to acquire any of its assets . . . or take any similar action except for the sale of production or inventory in the ordinary course of Borrower's business."  See Docket No. 26-3, p. 18.  The evidence establishes that the leases had already expired before Lexar purchased them.  Once the leases expired on their own terms, LexMac's and Novus's interests in the leases reverted back to the lessors (the landowners).  See Natural Gas Pipeline Co. of Am. v. Pool, 124 S.W.3d 188, 192 (Tex. 2003).  Therefore, once the leases expired, the leases were no longer LexMac's and Novus's assets under the terms of the Credit Agreement.  Accordingly, the Court finds that neither Section 6.3(f) nor Section 7.4(c) of the Credit Agreement created a duty upon LexMac and Novus to obtain new leases in LexMac's name when the leases expired.

Section 3.2(c) of the Mortgage and Security Agreement requires LexMac and Novus to maintain the oil and gas leases in the mortgaged properties.  Section 3.2(c) provides:

> That Mortgagor will cause the oil, gas or oil and gas (or oil, gas and mineral) leases included in or relating to the Mortgaged Properties (herein called "Subject Leases") to be maintained and operated for the production of oil or gas in a good and workmanlike manner and in accordance with sound field practices and all applicable federal, state and local laws, rules and regulations and will not allow any of Subject Leases to be surrendered, abandoned, or terminated or impaired in any manner.

See Docket No. 26-4, p. 8.  Section 3.2(c) imposes an obligation on LexMac and Novus to not allow the leases to be surrendered, abandoned, or terminated.  However, Section 3.2(c) does not impose an obligation on LexMac and Novus to prevent a lease from expiring on its expiration date.  The Plaintiffs have not alleged that the leases expired due to any improper action of LexMac and Novus.

Accordingly, the Court finds that Section 3.2(c) of the Mortgage and Security Agreement does not impose an obligation on LexMac and Novus to prevent the leases from expiring on their own terms, after the passage of time, nor does it require LexMac and Novus to obtain new leases on the expiring leases.

The Plaintiffs contend that because the Credit Agreement defines lease as including "any extension" and "renewals" the document imposed a duty on LexMac and Novus to renew the expiring leases.  The definition of "leases" merely clarifies that it includes oil and gas leases already obtained and "any extension, renewals, corrections, modifications, elections or amendments" to the leases that have or will be obtained.  The provisions of the loan documents do not provide that LexMac and Novus are obligated to obtain extensions, renewals, corrections, modifications, elections, or amendments on the expiring leases.

Section 12.6 of the Credit Agreement contains a merger clause providing that it and the other agreements to which it refers constitute the entire agreement between the parties.[8]  Both the Credit Agreement and the Mortgage and Security Agreement contain provisions providing that its terms will not be superseded by any subsequent oral agreements.[9]

---

[8]  Section 12.6 of the Credit Agreement provides:

This Agreement and the other agreements to which this Agreement refers, together with all exhibits, schedules and annexes attached to any of them, constitute the final, entire agreement among the parties and supersede any prior oral or written and all contemporaneous oral proposals, commitments, promises, agreements and understandings between the parties with respect to the subject matter of this Agreement and the other Loan Documents, all of which are merged into and replaced by the Loan Documents.

See Docket No. 26-3, p. 39.

[9]  Section 12.21 of the Credit Agreement provides:

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL

26

The Court finds that the plain language of the Credit Agreement and the Mortgage and Security Agreement does not evidence a mutual intent by the parties to impose a duty on LexMac and Novus to obtain new leases on the expiring acreage. The Credit Agreement and Mortgage and Security Agreement imposed duties on LexMac and Novus with respect to the then existing leases that comprised the collateral, but no mention was made in the agreements as to the duties upon LexMac and Novus once the leases expired on their own terms, after the passage of time. The Credit Agreement and Mortgage and Security Agreement are voluminous and their provisions are designed with detail and precision to bind LexMac and Novus. The Plaintiffs could have added provisions pertaining to the expiration of the leases but chose not to do so. The Court finds and declares that LexMac and Novus did not have a duty under either the Credit Agreement or the Mortgage and Security Agreement to obtain new leases when the collateral leases expired in accordance with their own terms.

---

AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE MATTERS ADDRESSED IN THEM AND CANNOT AND WILL NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS.**

See Docket No. 26-3, p. 44 (emphasis in original).

The Mortgage and Security Agreement contains a similar provision disallowing oral agreements:

**THIS WRITTEN AGREEMENT AND THE OTHER SECURITY DOCUMENTS DESCRIBED IN THE CREDIT AGREEMENT REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

See Docket No. 26-4, p. 30 (emphasis in original).

**b)** **ACTION TO QUIET TITLE AND REMOVE THE LIS PENDENS**

Lexar argues that "Macquarie Bank has filed the *lis pendens* based on damage claims that arise from a non-existent duty on the part of Novus Operating and LexMac to take wholly new leases for the benefit of Macquarie Bank."  See Docket No. 75, ¶ 54.  Lexar also argues that the "*lis pendens* is a direct impediment to Lexar Energy's ability to develop the leases, and coupled with the top leases by Macquarie Barnett completely inhibits the development of the leases.  This is a harsh and arbitrary effect that must be remedied."  See Docket No. 75, ¶ 56.  The Plaintiffs contend that MBL was within its rights to file the lis pendens because the NPORIC continued to encumber the leases obtained by Lexar.

The lis pendens was filed by MBL, a third-party to the NPORIC.  The Court finds that MBL had standing to file the lis pendens on behalf of Macquarie Americas because the NPORIC "was intended to provide Macquarie Bank and/or Macquarie Americas an overriding royalty interest in the subject leases."  See Docket No. 112 (Defendants' and Counter-Claimants' Response to the Plaintiffs' and Third-Party Defendant's Motion for Summary Judgment).

Section 28-05-08 of the North Dakota Century Code allows a court to cancel a lis pendens:

> The court in which the action was commenced, at any time, on application of any person aggrieved and on good cause shown and on such notice as directed or approved by the court, may order the notice authorized by section 28-05-07[10] to be canceled of record in whole or in part by the recorder of any county in whose office the same may have been filed for record, and such cancellation must be made by an endorsement to that effect on the margin of the record which shall refer to the order.

Section 32-17-01 of the North Dakota Century Code authorizes a party with an interest in real property to bring a quiet title action against another party claiming an interest in the property to

---

[10] N.D.C.C. § 28-05-07 describes the effect of a lis pendens.

28

determine adverse claims.  "[A] quiet title action is a direct action to determine what, if any, interest each party has in a tract of land, and a court's decision shall adjudicate the nature and extent of the parties' claims and shall determine the validity, superiority, and priority of the claims."  <u>Dennison v. N.D. Dep't of Human Servs.</u>, 640 N.W.2d 447, 453 (N.D. 2002).

The Court has determined that Lexar is an affiliate of LexMac and Novus, and that it entered into new leases on the acreage within one year of its expiration.  As a result, the Court finds that new leases are subject to the terms of the NPORIC.  The record is clear that Lexar's leases have not been developed and, therefore, there are no net profits due under the NPORIC.  If the leases were developed, any net profits would be subject to the terms of the NPORIC.  Accordingly, the Court denies the Defendants' and Counter-Claimants' request to quiet title and remove the lis pendens on the subject leases, and grants summary judgment in favor of the Plaintiffs and Third-Party Defendant on this claim.

**c)**      <u>**MISAPPROPRIATION AND MISUSE OF CONFIDENTIAL AND PROPRIETARY INFORMATION**</u>

The Defendants and Counter-Claimants contend that LexMac and Novus provided confidential and proprietary information to MBL to secure loans, and that MBL misappropriated and used this information for its own purposes to acquire leases in North Dakota.  The Plaintiffs contend they have no contractual duty of confidentiality, and that the record is devoid of any evidence they misappropriated and misused confidential information.

Knickel concedes that the parties have not entered into a written confidentiality agreement.  <u>See</u> Docket No. 57-3, p. 45.  Nor did Knickel ever request a written confidentiality agreement because he believed that "it's kind of a standard given in the industry."  <u>See</u> Docket No. 57-3, p. 46.

29

There is no general tort claim for "misappropriation of confidential information" under either North Dakota or Texas law. See Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc., 879 S.W.2d 89 (Tex. App. 1994). Texas recognizes a claim for "misappropriation of trade secrets." Calce v. Dorado Exploration, Inc., 2010 WL 1173112, at *14 (Tex. App. Mar. 29, 2010) (unpublished). To recover for a misappropriation of trade secrets, a plaintiff is required to prove "(1) existence of a trade secret, (2) breach of a confidential relationship or improper discovery of a trade secret, (3) use of the trade secret without the plaintiff's authorization, and (4) resulting damages." Id.

Knickel testified that LexMac and Novus provided confidential information consisting of structure maps, isopach maps, petrophysical evaluations, seismic interpretations, well histories, geophysical data and interpretations from those maps, and log valuations of land in the Cedar Butte Project area. See Docket No. 57-3, pp. 40, 44. The Defendants contend that the data provided by LexMac and Novus could not be gleaned merely from public sources, but included reports and analyses that took substantial time and effort to complete. The Texas Supreme Court has stated, "It is undisputed that the oil and gas industry typically treats seismic data and other methods for obtaining subsurface geological information as trade secrets." In re Bass, 113 S.W.3d 735, 740 (Tex. 2003). Texas courts and courts in other jurisdictions also consider seismic data as trade secrets. See id. at 740, 742 (citing Musser Davis Land Co. v. Union Pac. Res., 201 F.3d 561, 569 (5th Cir. 2000); Tidelands Royalty "B" Corp. v. Gulf Oil Corp., 804 F.2d 1344, 1351 (5th Cir. 1986); Phillips Petrol. Co. v. Stryker, 723 So. 2d 585, 587 (Ala. 1998); Amoco Prod. Co. v. Laird, 622 N.E.2d 912, 918 (Ind. 1993)). Data consisting of subsurface gas reserves, including reserve estimates and future revenue projections are also trade secrets in Texas. See In re XTO Res. I, LP, 248 S.W.3d 898, 900-

30

04 (Tex. App. 2008).  The Court finds that the data provided by LexMac and Novus to MBL is a trade secret under Texas law.

North Dakota also recognizes a claim for "misappropriation of trade secrets."  North Dakota follows the Uniform Trade Secrets Act (UTSA) which is codified at N.D.C.C. ch. 47-25.1.  See CDI Energy Servs., Inc. v. West River Pumps, Inc., 2007 WL 4180581, at *3 (D.N.D. Nov. 20, 2007) (unpublished).  Pursuant to N.D.C.C. § 47-25.1-03, a plaintiff is entitled to recover damages for the misappropriation of a trade secret.

Under the UTSA, a "trade secret" is defined as follows:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

> (a)   Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (b)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.D.C.C. § 47-25.1-01(4).

In N. States Power Co. v. N.D. Pub. Serv. Comm'n, 502 N.W.2d 240 (N.D. 1993), the North Dakota Supreme Court affirmed the Public Service Commission's decision that price and volume data in publicly filed copies of gas transportation contracts were trade secrets under North Dakota law because the data was not generally known or readily ascertainable.  The Defendants assert that the data which LexMac and Novus provided to MBL to secure financing was not generated entirely by public means nor was it readily ascertainable, but required substantial time and effort to determine the oil and gas development potential in the Cedar Butte Project area.  The Court finds that under North Dakota law the data provided by LexMac and Novus to MBL, which consisted of structure

31

maps, isopach maps, petrophysical evaluations, seismic interpretations, well histories, geophysical

data and interpretations from those maps, and log valuations of land in the Cedar Butte Project area,

constitutes a trade secret under the UTSA.

Even though the data is a "trade secret" under North Dakota and Texas law, the Plaintiffs are

not liable unless they misappropriated the trade secret.  The UTSA defines "misappropriation" as

follows:

(a)      Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b)      Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (1)    Used improper means to acquire knowledge of the trade secret;

    (2)    At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

        (a)    Derived from or through a person who had utilized improper means to acquire it;

        (b)    Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (c)    Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (3)    Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

N.D.C.C. § 47-25.1-01(2).

The Credit Agreement and Mortgage and Security Agreement gave MBL a security interest

in LexMac's and Novus's geophysical and seismic data.  The Credit Agreement gave MBL "a first-

priority mortgage lien and a first-priority perfected security interest in all of the real and personal

property" of LexMac and Novus.  See Docket No. 26-2, p. 8.  "Personal property" under the Credit Agreement includes "all general intangibles (including all payment intangibles and rights to seismic and other geophysical data) and all permits, licenses, books and records related to the Properties or the business of Borrower as it relates to the Properties in any way whatsoever."  See Docket No. 26-2, p. 19.

The Mortgage and Security Agreement gave MBL a continuing security interest in "[a]ll accounts, equipment, inventory and contract rights and other general intangibles as such terms are defined in the Uniform Commercial Code from time to time in effect in the State of North Dakota (including, without limitation, all seismic data, geological data, geophysical data and interpretations of any of the foregoing to the extent a security interest therein may be assigned) constituting a part of, relating to, or arising out of the property and collateral . . . ."  See Docket No. 26-4, p. 4.

The Defendants must establish that MBL misappropriated the geophysical and seismic data despite the provisions in the Credit Agreement and Mortgage and Security Agreement.  The evidence establishes that LexMac and Novus voluntarily provided the geophysical and seismic data to MBL to secure financing and, therefore, N.D.C.C. §§ 47-25.1-01(2)(a), (b)(1), (b)(2)(a), and (b)(3) are inapplicable.  The only possible means by which the Defendants could establish misappropriation is if MBL disclosed the geophyscial and seismic data but owed a duty to maintain the secrecy of the information under N.D.C.C. §§ 47-25.1-01(2)(b)(2)(b) or (b)(2)(c).

The Defendants allege that MBL, as a bank, owed a duty of confidentiality to its customers, LexMac and Novus.  See Docket No. 112 (citing United Jersey Bank v. Kensey, 704 A.2d 38 (N.J. Super. Ct. App. Div. 1997); Barnett Bank of Marion County, N.A. v. Shirey, 655 So. 2d 1156 (Fla.

Dist. Ct. App. 1995); Djowharzadeh v. City Nat'l Bank & Trust Co. of Norman, 646 P.2d 616 (Okla.

Civ. App. 1982); Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648 (Minn. 1976)).

In Djowharzadeh, the plaintiff alleged that the bank wrongfully disclosed his investment

information to the wives of the bank's president and of the chairman of the board of directors.   In

considering whether the bank owed a duty of confidentiality to its customers, the Oklahoma Court

of Appeals stated:

> Customer has the duty to fairly and fully disclose his assets, personal credit history and circumstances, intimate intra-family situations, past conduct, future plans and a myriad of other sometimes highly personal information.  Details concerning the purpose of the loan – for reasons amply demonstrated by the facts of this case – are no less private to the applicant.  In fact, most of the information which is routinely demanded by and candidly disclosed to a bank by its customer is so critically personal that it would not even be shared with the customer's own minister.

> This intimate, private information is not furnished to any bank official lightly, nor, strictly speaking, voluntarily.  Rather, the borrower is compelled to disclose the information.  The delicately balanced relationship thus temporarily created is not, in ordinary cases, one composed of equals because of the inordinate power of the bank.  The precarious position of the borrower and the relatively superior position of the bank mandates there be a counterbalancing special duty imposed on the part of the bank.

> Banks exist and operate almost solely by using public funds and are invested with enormous public trust.  Their financial power within the community amounts to a virtual financial monopoly in the field of money lending.  The legislature has carefully defined their corporate charge within finite limits in direct proportion to their power.

> One goal of this system is to assure that banks do not compete financially with their customers, but rather serve public financial needs fairly and evenly.  Implicit in this policy of fair dealing and evenhandedness is a requirement that banks not use their favored position to the detriment of their customers, either directly or indirectly.

> If it were otherwise, banks would quickly become pervasive financial webs, serving only their owners, managers and friends by trapping all the best investments being innocently [funneled] by the public through their loan departments.  Such a policy would soon destroy their public usefulness and benefit neither the public nor, ultimately, the banking industry.

. . .

> We hold, under these circumstances, Bank's relationship to a loan applicant implicitly imposes the duty to keep the contents of loan applications confidential. This duty has existed traditionally and continues to exist, if not specifically in the law books, at least in the mind of the public in general and within the banking community in particular.

Djowharzadeh, 646 P.2d at 619-20.

The ruling in Djowharzadeh was based on the relationship that a bank has with its customers in requiring its customers to produce confidential information. In Texas, the relationship between a bank and its customers generally does not create a special or fiduciary relationship. Berry v. First Nat'l Bank of Olney, 894 S.W.2d 558, 560 (Tex. App. 1995). Fiduciary relationships may arise from "'a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.'" Four Bros. Boat Works, Inc. v. Tesoro Petrol. Cos., Inc., 217 S.W.3d 653, 668 (Tex. App. 2006) (quoting Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 287 (Tex. 1998)). "A confidential relationship exists in cases in which 'influence has been acquired and abused, in which confidence has been reposed and betrayed.'" Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., 48 S.W.3d 865, 879 (Tex. App. 2001) (quoting Associated Indem. Corp., 964 S.W.2d at 287).

The record establishes that LexMac and Novus provided MBL with a wealth of information pertaining to the Cedar Butte Project, including seismic and geophysical data which could not be gleaned merely by public sources. MBL acted in a capacity greater than a traditional lender as the owner of a 40-percent net profits overriding royalty interest in the development of the collateral leases. Raymond Weems agreed that there was an auspice of confidentiality in LexMac and Novus providing the information to MBL which did not need to be in writing. See Docket No. 59-5, p. 6.

35

The Plaintiffs concede that in this case "most, if not all, of [their] documents are confidential. Apart from the publicly available documents" the Plaintiffs do "not want information regarding its N.D. operations released to third parties." See Docket No. 112-4.

The Court finds that MBL had a duty to keep the information provided by LexMac and Novus confidential. A confidential relationship was created between LexMac, Novus, and MBL due to the nature of the lending and net profits arrangement and the value of the information provided. LexMac and Novus had a reasonable expectation that MBL would keep its information confidential, not disclose it to third parties, and not misuse the information for personal gain.

The Defendants allege that MBL disclosed the data to Macquarie Barnett and that entity used the data to obtain additional leases in the Cedar Butte Project area:

> The evidence is clear that Macquarie Bank, through Macquarie Barnett, sought to acquire acreage in North Dakota in the very area which the confidential information addresses. Contrary to Macquarie Bank's current story, it was not limited to the leases that were pledged as collateral. In fact, Macquarie Bank approved a $500,000 expenditure to cover its "leasing strategy" of leasing all available acreage in the area, and Macquarie Barnett has actually leased properties that were not collateral on the loan. Moreover, Macquarie Bank's internal documents show that it was enamored with the reserve estimates in that area, and that its senior executives were impressed with the "larger project" value.

See Docket No. 112. Pre-foreclosure, in a January 29, 2008 "Status Report," MBL expressly incorporates and uses the confidential information that LexMac and Novus provided to MBL for lending. See Docket No. 118-4, pp. 16-22. The Status Report also mentions MBL's interest in behind-pipe Interlake reserves, additional Red River development, a Madison PUD development, and Nisku exploration potential, which are all additional reserve potentials. The Status Report indicates that the Cedar Butte Project had an overall PV10[11] value of $21.5 million, with a "proved

---

[11] "PV10" is the present value of future net revenues to be generated from production, discounted by 10%. It is a "metric" commonly used in the oil and gas industry which MBL also uses.

component" of $20.9 million.  See Docket No. 118-4, p. 2.  Post-foreclosure, a May 24, 2008 email

from MBL employee Dean King provides that Macquarie Barnett "would like to spend up to $500k

securing additional acreage adjacent to the existing Lexmac acreage."  See Docket No. 109-4.   A

June 20, 2008 "Approval Request" from Bill Jentsch, the associate director of MBL,[12] to Gavin

Bradley, the executive director of MBL, provided the following steps, in part, to monetize Macquarie

Barnett's position:

> (1)    Complete the foreclosure process on the properties not reassigned to and by
>         Brad Knickel – completed
>
> (2)    Secure remaining collateral through litigation against Brad Knickel – under
>         way
>
> (3)    Have Macquarie Barnett LLC approved as named operator in the state of
>         North Dakota with Traton Engineering as contract operator – underway
>
> (4)    Top lease the acreage in litigation as a preventative measure to ensure the
>         acreage remains available at the time an exit is realized.  Also lease additional
>         strategic open acreage to strengthen [Macquarie Barnett's] position or
>         available options for an exit strategy – underway

See Docket No. 118-3, p. 4.  The Approval Request noted an overall PV10 project value of $33.8

million for an investment of $13.4 million.  See Docket No. 118-3, p. 5.

       Bill Jentsch testified that the PV10 values were calculated from the reserve estimates

provided by Knickel:

> Q. [Counsel for the Defendants]:     When you factored the PV 10 in this memo,
>                                       what information were you using to calculate
>                                       that?
>
> A. [Bill Jentsch]:                    Capital, volumes pricing, operating expenses.

---

[12]   Apart from being the associate director of MBL, Bill Jentsch is responsible for overseeing Macquarie
Barnett's actions regarding the Ann #1 Well.  See Docket No. 59-6, pp. 4-5.

Q. [Counsel for the Defendants]:    Did you have to have information on the reserves?

A. [Bill Jentsch]:    Estimated reserves.

Q. [Counsel for the Defendants]:    And where did you obtain that information?

A. [Bill Jentsch]:    That was, basically, from some of the face value work that had been done – my face value, because I didn't go into it. We're currently underway building our own reserves portfolio. But for this purpose, I took exactly a lot of the work that had been done previously with Rudy [Wildenstein] and Brad [Knickel].

. . .

Q. [Counsel for the Defendants]:    You've mentioned that you're currently in the process of building your own reserve portfolio. Right?

A. [Bill Jentsch]:    Right.

Q. [Counsel for the Defendants]:    At the time this memo was prepared, you were relying on work that had already been done by Mr. Knickel and Mr. Wildenstein, correct?

A. [Bill Jentsch]:    To a certain degree, that's correct. But the production tests were in the files, so that was a starting point. And then some idea of the scoping was from the prior reserves.

See Docket No. 59-6, p. 14.

It is undisputed that MBL and Macquarie Barnett share directors, offices, and employees. MBL and Macquarie Barnett are essentially the same entity, run by the same people, with the same goals and objectives. Macquarie Barnett is a wholly-owned subsidiary of MBL that was created to foreclose on the collateral of LexMac and Novus. See Docket No. 120, p. 4 n.2. Both MBL and Macquarie Barnett were interested in maximizing the return on the overall project which included

the Ann #1 Well and surrounding area.  Even post-foreclosure, there was evidence that MBL relied on information provided by Knickel in its project valuations.  Given the undeniable similarities between MBL and Macquarie Barnett, and Bill Jentsch's testimony that he relied on information provided by Knickel post-foreclosure, the Court finds that there is a genuine issue of material fact as to whether MBL misappropriated LexMac's and Novus's confidential and proprietary information by disclosing it to Macquarie Barnett and whether such information was improperly used for MBL's and Macquarie Barnett's gain either to secure maximum return or to "compete" with LexMac and Novus in violation of N.D.C.C. §§ 47-25.1-01(2)(b)(2)(b) or (b)(2)(c).

MBL contends that even if there is a genuine issue of material fact as to whether it used LexMac's and Novus's confidential and proprietary information, that information had been pledged as collateral for the loan, and MBL had a continuing security interest in that information.  The Mortgage and Security Agreement provides that MBL has a continuing security interest in the following property:

> (g)     All accounts, equipment, inventory and contract rights and other general intangibles as such terms are defined in the Uniform Commercial Code from time to time in effect in the State of North Dakota (including, without limitation, all seismic data, geological data, geophysical data and interpretations of any of the foregoing to the extent a security interest therein may be assigned) constituting a part of, relating to, or arising out of the property and collateral . . . .

See Docket No. 26-4, p. 4.  The "Sheriff's Certificate of Sale," dated April 7, 2008, provided that Macquarie Barnett purchased, for the amount of $5,400,000: (1) all of LexMac's and Novus's rights, title, and interest in seven oil, gas, and mineral leases; and (2) all of LexMac's and Novus's rights, title, and interest "in and to any and all improvements, other constructions, equipment, and personal property located on the real property described above that are used for, held for use, or useful in

connection with the operating, working, or development of such real property to produce oil, gas, or minerals." See Docket No. 101-6.  The Sheriff's Certificate of Sale does not provide that  general intangibles, which includes all seismic data, geological data, geophysical data, and any interpretations thereof, were part of the foreclosure proceedings.   Accordingly, MBL never foreclosed on the general intangibles of LexMac and Novus.  Summary judgment is denied on this claim.

### d)      TORTIOUS INTERFERENCE

The Defendants and Counter-Claimants contend that MBL and Macquarie Barnett have tortiously interfered with their business practices by (1) inappropriately seeking and acquiring leases based on confidential and proprietary information provided by LexMac and Novus; (2) filing an improper lis pendens in an attempt to cloud title on Lexar's leases and prevent the development of those leases; (3) using the confidential and proprietary information provided by LexMac and Novus to compete with LexMac, Novus, and Lexar by top leasing Lexar's existing leases; and (4) wrongfully threatening landowners with liens on their mineral interests.

The North Dakota Supreme Court has recognized a cause of action for tortious interference with business advantage and has held that the following elements must be shown:

> [I]n order to prevail on a claim for unlawful interference with business, a plaintiff must prove the following essential elements:  (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted.

Lochthowe v. C.F. Peterson Estate, 692 N.W.2d 120, 126 (N.D. 2005) (quoting Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc., 628 N.W.2d 707, 717 (N.D. 2001)).  "By independently

tortious we do not mean that the plaintiff must be able to prove an independent tort. Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort." Trade 'N Post, 628 N.W.2d at 720; accord Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 726 (Tex. 2001).

### i)    ACQUIRING LEASES

The Defendants and Counter-Claimants contend that Macquarie Bank developed a "well-thought-out 'strategy' to interfere with Lexar Energy's ability to develop its leases. . . . These actions were not justified, and were independently tortious because they involved Macquarie Bank and Macquarie Barnett's improper use of confidential and trade secret information." See Docket No. 112. The Court has determined that there is a genuine issue of material fact as to whether the Plaintiffs and Third-Party Defendant misappropriated and misused LexMac's and Novus's confidential geophysical and seismic information in violation of N.D.C.C. §§ 47-25.1-01(2)(b)(2)(b) or (b)(2)(c) for the purpose of acquiring additional leases. Partial summary judgment is denied on this portion of the claim of tortious interference.

### ii)    FILING THE LIS PENDENS

The Defendants and Counter-Claimants contend that "Macquarie Bank has filed [an] improper *lis pendens* in an attempt to cloud title to property and to prevent Lexar Energy from developing the leases." See Docket No. 75. North Dakota courts have not considered whether the filing of a lis pendens is privileged. Texas courts have considered this issue and determined that the filing of a lis pendens is absolutely privileged and cannot form the basis of a cause of action for

41

tortious interference.  See Chale Garza Invs., Inc. v. Madaria, 931 S.W.2d 597, 600-01 (Tex. App. 1996); Bayou Terrace Inv. Corp. v. Lyles, 881 S.W.2d 810, 818 (Tex. App. 1994).  Other courts have also found that the filing of a lis pendens is absolutely privileged.  Zamarello v. Yale, 514 P.2d 228 (Alaska 1973); Lone v. Brown, 489 A.2d 1192 (N.J. Super. Ct. App. Div. 1985); Woodcourt II Ltd. v. McDonald Co., 173 Cal. Rptr. 836 (Cal. Ct. App. 1981); Procacci v. Zacco, 402 So. 2d 425 (Fla. Dist. Ct. App. 1981).  Other courts have also found that the filing of a lis pendens is not absolutely privileged and damages may be awarded for its improper filing.  See Westfield Dev. Co. v. Rifle Inv. Assocs., 786 P.2d 1112, 1117 (Colo. 1990) (finding that the filing of a lis pendens may be protected by a qualified privilege, not an absolute privilege); Birch v. Fuller, 337 P.2d 964 (Utah 1959); Ex parte Boykin, 656 So. 2d 821, 826 n.4 (Ala. Civ. App. 1994); Vintage Homes, Inc. v. Levin, 554 A.2d 989, 993-94 (Pa. Super. Ct. 1989); Larson v. Zilz, 445 N.W.2d 699 (Wis. Ct. App. 1989).  The Court is persuaded by the courts which have found that the filing of a lis pendens is not absolutely privileged.

The filing of a lis pendens binds a purchaser of property described in the lis pendens to "all that in like manner affects his granter."  Bragg v. Burlington Res. Oil and Gas Co. LP, 763 N.W.2d 481, 485 (N.D. 2009) (quoting Borden v. Graves, 127 N.W. 104, 109 (N.D. 1910)).  A lis pendens serves as a tool to provide notice of an outstanding unrecorded title or right to the real property "'so that any one not a party to the action, holding an outstanding unrecorded title or right, may appear in the action, assert the same, and have the superiority of his claim adjudicated; otherwise, by the terms of the statute, he will be bound by all proceedings taken after the filing of such notice to the same extent as if he was a party to the action.'"  Bragg, 763 N.W.2d at 485 (quoting McKenzie County v. Casady, 214 N.W. 461, 465 (N.D. 1927)).  The Court has determined that Lexar's leases

are subject to the NPORIC.  MBL filed a lis pendens to assert a right, namely the right to a net profits overriding royalty interest, in Lexar's leases.  Accordingly, the Court finds that MBL was justified in filing the lis pendens to assert this right.  Partial summary judgment is granted in favor of the Plaintiffs and Third-Party Defendant on this claim.

### iii)        TOP LEASING LEXAR'S ACREAGE

The Defendants and Counter-Claimants contend that MBL and Macquarie Barnett's conduct of top leasing Lexar's acreage tortiously interfered with Lexar's ability to develop the leases.  "While it was once thought that '[t]opleasing has the same invidious characteristics as claim jumping', top leasing has become a useful and widespread business practice in the oil and gas industry in North Dakota, as well as in other regions."  Nantt, 382 N.W.2d at 659.  Therefore, top leasing is not an independent tortious act in North Dakota, and there is no evidence that top leasing is a tortious act in Texas.  The Court finds that the Defendants have failed to state a claim of tortious interference for MBL's and Macquarie Barnett's conduct of top leasing Lexar's acreage.  Partial summary judgment is granted in favor of the Plaintiffs and Third-Party Defendant on this claim.

### iv)        THREATENING LANDOWNERS WITH LIENS

The Defendants and Counter-Claimants contend that MBL and Macquarie Barnett wrongfully threatened landowners with liens on their mineral interests.  The record is devoid of any such conduct.  As a result, partial summary judgment is granted in favor of the Plaintiffs and Third-Party Defendant on this claim.

e)      **ALTER EGO**

The Defendants and Counter-Claimants contend that "Macquarie Bank is using Macquarie Barnett as a mere business conduit" and, therefore, are alter egos of one another. See Docket No. 75. The Defendants are requesting that the corporate identities of the two entities be disregarded and instead be treated as one. The Plaintiffs argue that the alter ego claim fails because the Defendants have failed to identify any injustice resulting from the entities being treated separately.

The determination of whether to disregard the corporate entity and find that a corporation is the alter ego of its ownership or management is a question of fact that is highly fact specific. Froemming v. Gate City Fed. Sav. & Loan Ass'n, 822 F.2d 723, 728 (8th Cir. 1987) (citing Jablonsky v. Klemm, 377 N.W.2d 560, 565 (N.D. 1985)).

North Dakota courts consider a number of factors in determining whether to pierce the corporate veil:

> "[I]nsufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealing."

Froemming, 822 F.2d at 728 (quoting Hilzendager v. Skwarok, 335 N.W.2d 768, 774 (N.D. 1983)). None of these factors are dispositive. There must be "an element of injustice, inequity or fundamental unfairness" present before the court may properly pierce the corporate veil. Id. The burden of establishing the necessary elements for piercing the corporate veil rests with the moving party. Coughlin Constr. Co. v. Nu-Tec Indus., Inc., 755 N.W.2d 867, 873 (N.D. 2008).

44

MBL and Macquarie Barnett share directors, offices, and employees.  Raymond Weems, the executive director of MBL and a director of Macquarie Barnett, testified as to the similarities between MBL and Macquarie Barnett:

| | |
|---|---|
| Q. [Counsel for the Defendants]: | Okay.  Where does Macquarie Barnett office, if it has an office? |
| A. [Raymond Weems]: | Houston. |
| Q. [Counsel for the Defendants]: | Same place as Macquarie Bank? |
| A. [Raymond Weems]: | It's a single-purpose company. |
| . . . | |
| Q. [Counsel for the Defendants]: | If it has an office, it's the same thing as Macquarie Bank in Houston? |
| A. [Raymond Weems]: | Correct. |
| Q. [Counsel for the Defendants]: | Okay.  Who are the other directors at Macquarie Barnett? |
| A. [Raymond Weems]: | I'm embarrassed to say I'm not sure. |

See Docket No. 59-5, p. 3.  Raymond Weems testified that MBL and Macquarie Barnett are "synonymous" with each other.  See Docket No. 59-5, p. 24.

Michael Sextro, the senior vice-president of administration and investment compliance of MBL, testified that Macquarie Barnett shares employees with MBL:

| | |
|---|---|
| Q. [Counsel for the Defendants]: | And who runs Macquarie Barnett? |
| A. [Michael Sextro]: | Macquarie Barnett is a subsidiary of Macquarie Holdings. |
| . . . | |
| Q. [Counsel for the Defendants]: | How many employees does Macquarie Barnett have here in Houston? |

| | |
|---|---|
| A. [Michael Sextro]: | It would be – as far as employees were – were shared, we would have myself, William Jentsch, Paul Beck is a director, Ray Weems is a director, and there's a director in New York. |
| Q. [Counsel for the Defendants]: | Who pays your salary?  What entity? |
| A. [Michael Sextro]: | Macquarie Bank Limited pays my salary, but there's a sharing agreement that's in place that basically allocates a portion of my salary to Macquarie Barnett. |

See Docket No. 52-2, pp. 15-16.

In corporate documents it is difficult to distinguish between the Macquarie entities.  In an annual report attached to a June 23, 2008 email from Macquarie employee Dean King, "MAC," presumably an abbreviation for Macquarie Americas, is identified as the entity which filed a lis pendens on Lexar's leases.  See Docket No. 109-2, p. 2.  In an August 2008 Creditwatch report, Macquarie Barnett, identified as "MBLLC," is listed as the entity responsible for filing the lis pendens.  See Docket No. 109-3, p. 1.

In the Plaintiffs' memorandum in support of summary judgment, the Plaintiffs argue that MBL and Macquarie Barnett are the same entity.  The Plaintiffs state:

> Macquarie Barnett, however, is a wholly-owned subsidiary of Macquarie Holdings. It was established for the sole purpose of holding the collateral that MBL foreclosed upon.  Macquarie Barnett is in fact a single purpose entity that shares both its office address and certain employees with MBL's representative office in Houston.

See Docket No. 100.  However, the Plaintiffs contend that the Defendants have failed to identify any injustice, inequity, or fundamental unfairness to pierce the corporate veil of Macquarie Barnett.

It is undisputed that Macquarie Barnett is a subsidiary of Macquarie Holdings and MBL. Macquarie Barnett was created for the sole purpose of holding and operating oil and gas assets that

were being foreclosed on by MBL, and only holds assets relating to this action.  See Docket Nos. 52-2, p. 16 and 109-1, p. 40.  The evidence establishes that Macquarie Barnett was formed shortly before the foreclosure sale of LexMac's and Novus's leases to hold the leases and develop them to maximize the overall project value.  The Court finds that there are genuine issues of material fact as to whether MBL and Macquarie Barnett are alter egos of each other, particularly as to whether Macquarie Barnett was merely a facade for MBL's individual dealings.  Summary judgment is denied on this claim.

### f) CONSPIRACY

The Defendants and Counter-Claimants contend that MBL and Macquarie Barnett conspired to tortiously interfere with "the prospective relations" of LexMac, Novus, and Lexar and to misappropriate the confidential and proprietary information provided by LexMac and Novus. See Docket No. 75.  The Plaintiffs argue that "Macquarie Barnett, however, is a wholly-owned subsidiary of Macquarie Holdings" and that "Macquarie Barnett is in fact a single purpose entity that shares both its office address and certain employees with MBL's representative office in Houston." See Docket No. 100.

"A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damage[s].'"  Hurt v. Freeland, 589 N.W.2d 551, 560 (N.D. 1999) (quoting Burr v. Kulas, 564 N.W.2d 631, 637 n.3 (N.D. 1997)); accord Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983).  The major difference between a criminal conspiracy and a civil conspiracy is that in

47

a civil conspiracy damages, and not the agreement, are the essence of the conspiracy.  <u>Hurt</u>, 589 N.W.2d at 560.

It is a general rule under North Dakota and Texas law that a corporation cannot conspire with itself through its agents.  <u>Cross v. Gen. Motors Corp.</u>, 721 F.2d 1152, 1156 (8th Cir. 1983); <u>Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.</u>, 300 S.W.3d 348, 381 (Tex. App. 2009).  However, Texas courts have determined that a parent corporation can conspire with its subsidiary.  <u>See</u> <u>Atl. Richfield Co. v. Long Trusts</u>, 860 S.W.2d 439, 447 (Tex. App. 1993); <u>Metro. Life Ins. Co. v. La Mansion Hotels & Resorts, Ltd.</u>, 762 S.W.2d 646, 651-52 (Tex. App. 1988); <u>Holloway v. Atl. Richfield Co.</u>, 970 S.W.2d 641, 644 (Tex. App. 1998).  The Court has determined that there are genuine issues of material fact as to whether MBL misappropriated LexMac's and Novus's confidential and proprietary information and whether MBL and Macquarie Barnett are alter egos of one another.  Accordingly, the Court finds that there are also genuine issues of material fact as to whether MBL and Macquarie Barnett conspired with each other to use confidential and proprietary information provided by LexMac and Novus.  Summary judgment is denied on this claim.

### g)      BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

The Defendants and Counter-Claimants contend that by entering into a lending transaction with MBL, LexMac and Novus entered into a relationship of trust with MBL.  The Defendants contend that MBL used their information in a competitive manner to pursue leases and the project on its own (or through Macquarie Barnett) and, therefore, violated its duty of good faith and fair dealing to LexMac and Novus.

48

Under North Dakota law, "'the doctrine of an implied covenant of good faith and fair dealing has only been applied to insurance contracts.'" WFND, LLC v. Fargo Marc, LLC, 730 N.W.2d 841, 851 (N.D. 2007) (quoting Dalan v. Paracelsus Healthcare Corp., 640 N.W.2d 726, 731 (N.D. 2002)). An insurance contract is not in dispute in this action and, therefore, there can be no breach of a duty of good faith and fair dealing under North Dakota law.

In Texas, a claim for breach of the duty of good faith and fair dealing is a tort action that arises from an underlying contract. Bank One, Tex., N.A. v. Stewart, 967 S.W.2d 419, 441 (Tex. App. 1998). A duty of good faith and fair dealing is not implied in every contract. F.D.I.C. v. Coleman, 795 S.W.2d 706, 708-09 (Tex. 1990). The relationship between a debtor and creditor alone does not create a duty of good faith and fair dealing. A duty may nonetheless arise: (1) by agreement; (2) between parties having a fiduciary relationship as a result of a long-standing, special relationship of trust and confidence between them (although mere subjective intent alone cannot create the duty of good faith and fair dealing); and (3) when an imbalance of bargaining power exists between the parties. Bank One, 967 S.W.2d at 441; F.D.I.C. v. Perry Bros., Inc., 854 F. Supp. 1248, 1259 (E.D. Tex. 1994). An informal fiduciary relationship arises from a moral, social, domestic, or purely personal relationship of trust and confidence which is also called a confidential relationship. Associated Indem. Corp., 964 S.W.2d at 287. Texas law recognizes confidential relationships in which "'influence has been acquired and abused, confidence has been reposed and betrayed.'" Noell v. Crow-Billingsley Air Park Ltd. P'ship, 233 S.W.3d 408, 414 (Tex. App. 2007) (quoting Associated Indem. Corp., 964 S.W.2d at 287). A special relationship between a borrower and lender traditionally exists when extraneous facts are present, such as excessive lender control over, or

influence in, the borrower's business activities.  See Wil-Roye Inv. Co. II v. Wash. Mut. Bank, FA, 142 S.W.3d 393, 410 (Tex. App. 2004).

The record establishes that LexMac and Novus provided MBL with confidential and proprietary information as collateral to secure financing.  The Court has determined that there are genuine issues of material fact as to whether MBL misappropriated and misused LexMac's and Novus's confidential and proprietary information.  The Court further finds that under the unique facts of this case, there was a confidential relationship between MBL and LexMac and Novus.  Raymond Weems admitted that MBL had a duty of confidentiality, and the record reveals that LexMac's and Novus's confidential and proprietary information was disseminated among MBL staff pre-foreclosure and used post-foreclosure to discuss Macquarie Barnett's plan to top lease Lexar's leases and secure new leases on property located adjacent to the property on which Lexar held leases.  Accordingly, the Court finds there are genuine issues of material fact as to whether MBL breached its duty of good faith and fair dealing to the Defendants and Counter-Claimants to not misappropriate and misuse their confidential and proprietary information.

Even if there are genuine issues of material fact as to this claim, the Plaintiffs contend the claim is barred by principles of res judicata and collateral estoppel because the Defendants and Counter-Claimants could have, but chose not to, raise the issue in the foreclosure proceedings.  The doctrines of res judicata and collateral estoppel prevent courts from relitigating claims and issues in order to promote the finality of judgments and conserve judicial resources.  Riverwood Commercial Park, L.L.C. v. Standard Oil Co., Inc., 729 N.W.2d 101, 106 (N.D. 2007).  The applicability of res judicata or collateral estoppel is a question of law fully reviewable on appeal.  Id.  Res judicata, or claim preclusion, prohibits the relitigation of claims that were raised, or could have been raised, in

50

prior actions between the same parties or their privies.  Ungar v. N.D. State Univ., 721 N.W.2d 16, 20 (N.D. 2006).  "Collateral estoppel, or issue preclusion, forecloses relitigation of issues of either fact or law in a second action based on a different claim, which were necessarily litigated, or by logical and necessary implication must have been litigated, and decided in the prior action."  Id. at 21.

"In order for an issue to be considered res judicata, it is not enough that it was involved in an earlier action, but it must have been actually litigated and decided in that action."  First State Bank of New Rockford v. Anderson, 452 N.W.2d 90, 93 (N.D. 1990).  The Defendants and Counter-Claimants did not make an appearance in the foreclosure proceedings, nor did they contest foreclosure.  The Defendants' and Counter-Claimants' basic allegation is that MBL and Macquarie Barnett misused their confidential and proprietary information to acquire leases on property located adjacent to the property on which Lexar held leases.  The newly-acquired leases were leases that neither LexMac nor Novus had an ownership in and which were not provided as collateral for lending.  Accordingly, Macquarie Barnett's conduct of acquiring these additional leases has no relationship to the foreclosure proceedings.  The Court expressly finds that the Defendants' and Counter-Claimants' claim for breach of the duty of good faith and fair dealing is not barred by principles of res judicata or collateral estoppel.  Summary judgment is denied on this claim.


### h)    UNFAIR LENDING PRACTICES AND LENDER LIABILITY

The Defendants and Counter-Claimants contend that MBL engaged in unfair lending practices:

> By the time the Ann #1 was drilled, Macquarie Bank had already declared the loan with LexMac and Novus Operating to be in default.  Yet, it continued to fund

> up to a certain point.  Relying on this funding, Novus Operating continued to develop
> the well, incurring over $1 Million in charges to vendors.  Once those vendors needed
> to be paid, but after Novus Operating had completed the well, Macquarie Bank
> stopped funding, leaving Novus Operating unable to pay the vendors, [much] less
> able to repay the loan.  Macquarie Bank refused to fund a minimal amount for rework
> operations on the well . . . .

See Docket No. 75.  There is no cause of action in either North Dakota or Texas for unfair lending

practices.  The Defendants and Counter-Claimants have not cited, nor could the Court find, any

relevant portion of the Uniform Commercial Code, any applicable federal statute, or any applicable

state statute in support of this claim.  As a result, summary judgment is granted in favor of the

Plaintiffs and Third-Party Defendant on this claim.


      **B.**      **DEFENDANTS' AND COUNTER-CLAIMANTS' MOTION FOR SUMMARY JUDGMENT**

The Defendants and Counter-Claimants move for summary judgment on all of the Plaintiffs'

claims, on its claim for declaratory judgment, and on its requests to quiet title and remove the lis

pendens.  The Plaintiffs have raised the following claims in their second amended complaint:  (1)

fraud; (2) conversion; (3) promissory estoppel; (4) breach of the Net Profits Overriding Royalty

Interest Conveyance[13]; and (5) piercing the corporate veil.

---

[13]   The Plaintiffs' claim for breach of the Net Profits Overriding Royalty Interest Conveyance was
addressed earlier in this order.

1)      **FRAUD**

The Plaintiffs allege that after LexMac's and Novus's loan was in default, Knickel promised individually, and on behalf of LexMac, that he would obtain new leases on the expiring leases in the name of LexMac to preserve MBL's collateral and Macquarie Americas' net profits overriding royalty interest in the leases. The Plaintiffs argue that they detrimentally relied on Knickel's and LexMac's promises. They also argue that Knickel and LexMac concocted a plan to negotiate new leases in the name of Lexar in order to avoid judicial foreclosure of the leases and to prevent Macquarie Americas from obtaining a net profits overriding royalty interest on the leases.

"'Fraud and deceit require misrepresentation of facts, suppression of facts, misleading another, or promising without intending to perform.'" WFND, 730 N.W.2d at 853 (quoting Schneider v. Schaaf, 603 N.W.2d 869, 874 (N.D. 1999)); accord Cotten v. Weatherford Bancshares, Inc., 187 S.W.3d 687, 703 (Tex. App. 2006) ("The elements of actual fraud are:  (1) a false, material representation was made, (2) that was either known to be false when made or was made without knowledge of its truth, (3) that was intended to be acted upon, (4) that was relied upon, and (5) that caused injury."). Fraud applies when there is a contract between the parties. WFND, 730 N.W.2d at 853. "'A key element in proving fraud or deceit is reliance by the complaining party upon the false or misleading representations.'" Dahl v. Messmer, 719 N.W.2d 341, 344 (N.D. 2006) (quoting Kary v. Prudential Ins. Co. of Am., 541 N.W.2d 703, 706 (N.D. 1996)). "'Fraud is never presumed, but must be proved by evidence that is clear and convincing.'" Id. (quoting Kary, 541 N.W.2d at 705)). Proof of actual damage proximately caused by the misrepresentation is a necessary element to proving fraud. Lang v. Schafer, 603 N.W.2d 904, 906 (N.D. 2000).

The Plaintiffs contend that Knickel and LexMac made representations that they would renew the expiring leases in the name of LexMac. The Court has determined that the loan documents did not require the Defendants to renew the leases. Therefore, any alleged representations were verbally made.

Section 12.6 of the Credit Agreement contains a merger provision providing that it is the final agreement:

> This Agreement and the other agreements to which this Agreement refers, together with all exhibits, schedules and annexes attached to any of them, constitute the final, entire agreement among the parties and supersede any prior oral or written and all contemporaneous oral proposals, commitments, promises, agreements and understandings between the parties with respect to the subject matter of this Agreement and the other Loan Documents, all of which are merged into and replaced by the Loan Documents.

See Docket No. 26-3, p. 39. Moreover, Section 12.21 of the Credit Agreement expressly states that there are no oral agreements:

> THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE MATTERS ADDRESSED IN THEM AND CANNOT AND WILL NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.
>
> **THERE ARE NO UNWRITTEN ORAL AGREEMENTS.**

See Docket No. 26-3, p. 44 (emphasis in original). The Mortgage and Security Agreement contains a similar provision disallowing oral agreements:

> **THIS WRITTEN AGREEMENT AND THE OTHER SECURITY DOCUMENTS DESCRIBED IN THE CREDIT AGREEMENT REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

See Docket No. 26-4, p. 30 (emphasis in original).

The parties dispute whether Knickel and LexMac made verbal representations to the Plaintiffs regarding the expiring leases.  The clear language of the Credit Agreement and the Mortgage and Security Agreement preclude subsequent oral agreements from superseding their terms.  Nonetheless, the "NO UNWRITTEN ORAL AGREEMENTS" clause does not "create a black hole of immunity that swallows any oral representations made, regardless of to whom or in relation to what."  In re Magna Cum Latte, Inc., 2007 WL 3231633, at *13 (Bankr. S.D. Tex. Oct. 30, 2007) (unpublished). The "NO UNWRITTEN ORAL AGREEMENTS" clause does not preclude the Plaintiffs from asserting that Knickel and LexMac promised to extend the leases to the extent that such obligation is separate from the lending agreements of the parties.

A contract may be written or oral, but essential to the existence of the contract is that (1) the parties are capable of contracting, (2) the parties consented, (3) a lawful object, and (4) sufficient cause or consideration.  N.D.C.C. § 9-01-02.  "A contract requires an offer, an acceptance of an offer, and a mutual acceptance and understanding between the offeror and the offeree as to the terms of the obligation."  Cooke v. Blood Sys., Inc. 320 N.W.2d 124, 128 (N.D. 1982).  The contract must be based upon a mutual assent of the parties.  Id.  "Mutual assent to a contract is indeed required, but that assent must be evidenced in some way, and if the evidence is clear enough, the contract will be binding, regardless of mental reservations or misunderstandings of one or both parties, in the absence of fraud or other recognized ground for setting aside the contract."  Amann v. Frederick, 257 N.W.2d 436, 439 (N.D. 1977).  Both Texas and North Dakota law provide that consideration is a necessary element to a valid contract.  See Belew v. Rector, 202 S.W.3d 849, 854 (Tex. App. 2006) ("Consideration is a fundamental element of every valid contract."); Farmers Union Oil Co. of New Eng. v. Maixner, 376 N.W.2d 43, 47 (N.D. 1985) ("'When there is a lack of consideration no

contract is ever formed.'" (quoting <u>First Nat'l Bank of Belfield v. Burich</u>, 367 N.W.2d 148, 152 n.3 (N.D. 1985)).

      Raymond Weems testified that Knickel promised to renew the leases in the name of LexMac. <u>See</u> Docket No. 59-5, p. 26.  However, Weems stated that Knickel wouldn't receive anything in consideration for obtaining these leases:

| | |
|---|---|
| Q. [Counsel for the Defendants]: | Okay.  Do you – and I'm asking you, Raymond Weems.  Do you believe that Brad Knickel promised to go get – acquire those leases for Macquarie Bank? |
| A. [Raymond Weems]: | Yes. |
| Q. [Counsel for the Defendants]: | You do? |
| A. [Raymond Weems]: | Uh-huh. |
| Q. [Counsel for the Defendants]: | Okay.  What was he going to receive in return for that promise? |
| A. [Raymond Weems]: | We'd pay the bonus. |
| Q. [Counsel for the Defendants]: | Which would go to the landowner? |
| A. [Raymond Weems]: | Correct. |
| Q. [Counsel for the Defendants]: | Okay.  So he wouldn't receive anything personally? |
| A. [Raymond Weems]: | No, he'd receive no consideration. |

<u>See</u> Docket No. 59-5, p. 26.

      Michael Sextro confirmed that Knickel promised to renew the leases even <u>after</u> MBL filed a notice of default on the loan and a notice of foreclosure:

| | |
|---|---|
| Q. [Counsel for the Defendants]: | Okay.  Let's turn to Paragraph 47 of the complaint.  Do you see where it |

|  |  |
|---|---|
|  | says, "When they made these promises, Knickel and LexMac had no intention of performing." Do you see that? |
| A. [Michael Sextro] | Yes, I do. |
| . . . |  |
| Q. [Counsel for the Defendants]: | Now, let's take the next sentence. "Rather, they enacted a plan to renew or release the leases in the name of Lexar." Do you see that? I'm still on Paragraph 47. |
| A. [Michael Sextro]: | Right. |
| Q. [Counsel for the Defendants]: | Now, the original leases were in the name of Lexar, were they not, sir? |
| A. [Michael Sextro]: | As far as I know, yes, they were. |
| . . . |  |
| Q. [Counsel for the Defendants]: | Well, you had already filed a notice of foreclosure, had you not, the bank? |
| A. [Michael Sextro]: | That's correct. |
| Q. [Counsel for the Defendants]: | You had already put the loan in default. Is that correct? |
| A. [Michael Sextro]: | That's correct. |
| Q. [Counsel for the Defendants]: | You had already sent a notice of default to the companies. Right? To the borrowers. Right? |
| A. [Michael Sextro]: | That's correct. |
| Q. [Counsel for the Defendants]: | And all this occurred before the events that you're complaining about in this paragraph. Right? |

A. [Michael Sextro]:                    The renewal process, if I recall, started
                                         prior to the foreclosure . . . .

See Docket No. 52-2, pp. 51.

The Court finds that the Plaintiffs have failed to provide any evidence that Knickel or LexMac would receive any consideration for renewing the leases in the name of LexMac. The evidence establishes that MBL had already declared the loan in default prior to Knickel making the alleged promise. Without consideration, a promise is gratuitous and is unenforceable under North Dakota and Texas law. The Plaintiffs have failed to establish any gain whatsoever for Knickel. Accordingly, the Court finds that the Plaintiffs have failed to allege sufficient facts to establish a verbal contract between the parties regarding the expiring leases.

Even though the Court finds that the alleged promise made by Knickel and LexMac does not constitute a contract, the Court must consider the Plaintiffs' allegations in light of deceit. "[A] promise made without any intention of performing it which does not meet the requirements of a contract between the parties may nevertheless satisfy the requirements of deceit, and the victim of that deceit may recover for any damage suffered." Erickson v. Brown, 747 N.W.2d 34, 45 (N.D. 2008). "One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers." Delzer v. United Bank of Bismarck, 527 N.W.2d 650, 653 (N.D. 1995). Pursuant to N.D.C.C. § 9-10-02, deceit is defined as follows:

(1)     The suggestion as a fact of that which is not true by one who does not believe
        it to be true;

(2)     The assertion as a fact of that which is not true by one who has no reasonable
        ground for believing it to be true;

(3)     The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4)     A promise made without any intention of performing.

The Plaintiffs argue that Knickel and LexMac promised to renew the leases in the name of LexMac.  As proof of this promise, the Plaintiffs provide copies of emails sent from MBL employees to Knickel indicating MBL's understanding of the expiring leases.  The Plaintiffs have failed to provide a single email from Knickel or memo from any of the numerous meetings that they had with Knickel to show that he promised to obtain new leases in the name of LexMac.  Nonetheless, several employees of MBL have testified that Knickel made such a promise.

Michael Sextro testified that Knickel made representations during meetings and in emails that he would renew the leases:

| | |
|---|---|
| Q. [Counsel for the Defendants]: | Okay.  Let's turn to Paragraph 47 of the complaint.  Do you see where it says, "When they made these promises, Knickel and LexMac had no intention of performing."  Do you see that? |
| A. [Michael Sextro]: | Yes, I do. |
| Q. [Counsel for the Defendants]: | Okay.  What do you base that on? |
| A. [Michael Sextro]: | Okay.  What that's based on is various meetings, e-mails that – in which Brad Knickel represented on behalf of LexMac that – that he was going to secure the lease extensions or secure the leases that back up the collateral.  And that has not been done. |

See Docket No. 52-2, p. 51

Raymond Weems testified that Knickel volunteered to renew the leases believing that it was more appropriate for him to seek the extensions than brokers hired by MBL:

Q. [Counsel for the Defendants]:    Did you and Brad have a conversation about – about Macquarie having its own brokers out there – out there trying to acquire leases?

A. [Raymond Weems]:    We did.

Q. [Counsel for the Defendants]:    And what was the substance of that discussion?

A. [Raymond Weems]:    I don't remember the exact timing. It may have been  – it was probably in the fall of – may have been the early fall of 2007. I think I saw an earlier memo that referenced Diamond Resources or whatever the name the broker was.

. . .

Q. [Counsel for the Defendants]:    Do you understand that Brad somehow learned that – that Macquarie had its brokers out there in the field?

A. [Raymond Weems]:    No, I don't – he may have told me that later –

Q. [Counsel for the Defendants]:    Okay.

A. [Raymond Weems]:    –but I'm the one that initiated the call. So I called him and told him that we were concerned about the acreage expiring and that we were prepared to – frankly because, you know, if you're about to be foreclosed on and you're not going to fight it, why do you care? I mean, you know, an apathetic debtor is not necessarily a good thing. I mean, Brad may not have cared to do anything with regard to LexMac.

So if he's moving away from the opportunity, then, you know, we want to fulfill that void so that we could be sure we have our collateral intact. But I felt, you know, it was appropriate to call Brad and say, "This is something we're considering. What do you think about it?"

60

He said, "No.  Let me do it.  We know the landowners, you know, so [i]t's more appropriate for us to do it."

<u>See</u> Docket No. 59-5, p. 25.

Knickel disputes he ever made any representations that he would renew all of the expiring leases, and contends that he only promised to extend the leases with automatic extensions, but Knickel has no written documentation in support of his position:

Q. [Counsel for the Plaintiffs]:   My question is:  Do you have any piece of paper, whether it's an E-mail or a letter, that was sent to either Ray Weems or someone else at Macquarie Bank in 2007 saying, "This is incorrect.  I did not agree to do this"?

A. [Bradley Knickel]:   Something that – I tried to clarify things to the extent I could by conversations and providing written data and spreadsheets that – that had information that showed the leases and showed what was going on.  I was completely open with these people and explained to them what was going on.  We'd sit down and have meetings.  We'd talk about the status of the leases.

And I'd say, "Well, here's the lease.  Here's what's going on with this and what's going on with that."

We'd talk about it.

They'd say, "Fine.  That's good."

We end up – meeting's over, you know, and I get some confusing E-mail about something, you know.  And then – and then these – these leases and then there – then – then there's things like them trying to take these leases that had a provision to an extension, and they send me an assignment to assign it into a – an entity I'm totally unfamiliar with.

61

. . .

| Q. [Counsel for the Plaintiffs]: | My question is:  Do you have any piece of paper, any letter, any note, any E-mail, that you sent to Ray Weems in 2007 disputing his characterization of your assurances? |
|---|---|
| A. [Bradley Knickel]: | I – [I] don't think so.  I'd have to look and see. I don't think so . . . . |

See Docket No. 57-3, p. 58.

The Plaintiffs allege that Knickel and LexMac repeatedly promised in emails and during meetings to renew the leases in the name of LexMac, but they have not provided a single handwritten note from a meeting with Knickel indicating that the issue of re-leasing was discussed.  Nor have the Plaintiffs provided a single email in response from Knickel evidencing such a promise.  "Although deceit is ordinarily a question of fact, it must be established by clear and convincing evidence.  In analyzing the propriety of summary judgment in a fraud or deceit case, it is appropriate to consider the quantum of proof necessary to support liability."  Erickson, 747 N.W.2d at 47 (citing WFND, 730 N.W.2d at 853; Smith v. Land O'Lakes, Inc., 587 N.W.2d 173, 176 (N.D. 1998)).

The Court finds that the Plaintiffs have failed to provide sufficient facts to allow a jury to find by clear and convincing evidence that Knickel and LexMac promised to renew the expiring acreage in LexMac's name.  Summary judgment is granted in favor of the Defendants and Counter-Claimants on this claim.

### 2)   CONVERSION

The Plaintiffs contend that the Defendants have misappropriated the expiring leases by transferring them to Lexar, KHL, or Mineral Land Services.  The general rule is that real property

is not subject to conversion.  Denke v. Mamola, 437 N.W.2d 205, 207 (S.D. 1989).  "'Conversion consists of a tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner.'" Doeden v. Stubstad, 755 N.W.2d 859, 863 (N.D. 2008) (quoting Buri v. Ramsey, 693 N.W.2d 619, 624 (N.D. 2005)) (emphasis added); accord Patel v. City of Everman, 179 S.W.3d 1, 16 (Tex. App. 2004).  An oil and gas lease conveys an interest in real property.  Petro Pro, Ltd. v. Upland Res., Inc., 279 S.W.3d 743, 750 (Tex. App. 2007); Mar Win Dev. Co. v. Wilson, 104 N.W.2d 369, 373 (N.D. 1960).

Even if North Dakota or Texas law permits causes of action for the conversion of real property, the action would not survive in this case.  During the life of the loan, MBL possessed a security interest, not an ownership interest, in the leases.  Any interest that MBL possessed expired with the leases.  Brent Poe, MBL's landman, testified that when a lease's term ends, the lease is null and void:

| | |
|---|---|
| Q. [Counsel for the Defendants]: | Okay.  Every oil and gas lease has a term.  Correct? |
| A. [Brent Poe]: | That is correct. |
| Q. [Counsel for the Defendants]: | What happens when the term runs? |
| A. [Brent Poe]: | The term – when the term ends, the lease expires, unless there are other – there are two – a couple of instances you could – at the end of a primary term, you could extend it by drilling operations or you could have a provision built into your oil and gas lease that allowed you to – allowed you to extend it. |
| Q. [Counsel for the Defendants]: | Okay.  Absent any attempt or provision to extend it, when the term runs, the lease expires.  Is that correct? |

63

| | |
|---|---|
| A. [Brent Poe]: | That is correct. |
| Q. [Counsel for the Defendants]: | What happens when the lease expires? |
| A. [Brent Poe]: | It is – |
| [Counsel for the Plaintiffs]: | Objection; form. |
| A. [Brent Poe]: | It is null and void.  There's no – there is no contract. |
| Q. [Counsel for the Defendants]: | Any property interest is extinguished. Correct? |
| [Counsel for the Plaintiffs]: | Objection to form. |
| A. [Brent Poe]: | That's correct. |

See Docket No. 59-4, pp. 8-9.

It is undisputed that the subject leases had fixed terms.  It is well-established that a fixed-period oil and gas lease terminates at the expiration of such period, unless the lease has been extended, such as for continued drilling, in compliance with the terms of the lease.  Morrison v. Swaim, 220 S.W.2d 493, 494 (Tex. App. 1949); Watson v. Rochmill, 155 S.W.2d 783 (Tex. 1941). Although a lessee is granted a fee simple determinable interest in the real property, that interest will automatically terminate if the event upon which it is limited occurs.  Anadarko Petrol. Corp. v. Thompson, 94 S.W.3d 550, 554 (Tex. 2002).  In this case, the terms of the leases expired, and any interest that LexMac and MBL had in those leases also expired after the passage of time due to the cessation of drilling.  Accordingly, the Court finds that the Plaintiffs' conversion claim fails as a matter of law.  Summary judgment is granted in favor of the Defendants and Counter-Claimants on this claim.

3)        **PROMISSORY ESTOPPEL**

The Plaintiffs contend that "Knickel promised that he and LexMac would re-lease, renew, reconvey, and record the at risk leases in LexMac's name thereby preserving the Collateral and the [net profits overriding royalty interest]," and the Plaintiffs relied on this promise and ceased its efforts to renew the expiring leases.  See Docket No. 78.  The Defendants and Counter-Claimants contend that there was no agreement as to the "terms of any alleged 'new' leases.  There was no discussion of length of the leases, prices, terms, royalties, etc.  This is insufficient to support a promissory estoppel claim."  See Docket No. 105.

A plaintiff alleging promissory estoppel must show:

(1)        a promise which the promisor should reasonably expect will cause a change of position by the promisee;

(2)        a substantial change in the promisee's position through action or forbearance;

(3)        justifiable reliance on the promise; and

(4)        injustice which can only be avoided by enforcing the promise.

Dalan, 640 N.W.2d at 731-32 (citing Peterson Mech., Inc. v. Nereson, 466 N.W.2d 568, 571 (N.D. 1991)).  "The promise must 'be clear, definite, and unambiguous as to essential terms before the doctrine of promissory estoppel may be invoked to enforce an agreement or to award damages for the breach thereof.'"  Univ. Hotel Dev., L.L.C. v. Dusterhoft Oil, Inc., 715 N.W.2d 153, 157 (N.D. 2006) (quoting Lohse v. Atl. Richfield Co., 389 N.W.2d 352, 357 (N.D. 1986)).  "Unsupported conclusory allegations are insufficient to withstand summary judgment."  Id.

The Plaintiffs contend that Knickel and LexMac promised to renew the expiring leases in the name of LexMac after the Plaintiffs had already filed a notice of default on the loan.  In support of this allegation, the Plaintiffs provide emails that employees of MBL had written to Knickel and

deposition testimony of MBL employees.  On October 18, 2007, Raymond Weems, sent an email

to Knickel stating,

> I am copying you on this e-mail to confirm your assurance to us that you/Lexmac will immediately endeavor to re-lease all expired and expiring acreage that has served as collateral for Lexmac's obligation to Macquarie Bank.  That assurance you gave to us is the reason we instructed our lease brokers to step down.

See Docket No. 115-2.  On February 12, 2008, Weems sent Knickel another email relating to

LexMac's expiring leases:

> As you will recall, last year when we first brought up our concerns about acreage expirations and suggested we could send out a team of local landmen to release the acreage on behalf of Macquarie (in anticipation of a foreclosure event), you suggested that would be inappropriate as this was Lexmac's responsibility and might send "mixed signals" to landowners.  We therefore shut down the lease brokers we had reviewing the matter, as Lexmac requested, in order for Lexmac to re-lease the acreage in an effort to [preserve] our collateral.

See Docket No. 26-9.  Apart from these emails and the deposition testimony of MBL's employees,

there is no other evidence that Knickel promised to renew the expiring leases in the name of LexMac.

North Dakota law requires that the promise be clear, definite, and unambiguous as to the

essential terms of the promise.  The alleged promise by Knickel, if there was one, is vague at best.

Knickel testified that the leases which did not contain extension clauses could have been renewed

or extended by renegotiating the terms with the landowners.  See Docket No. 57-3, p. 47.  Raymond

Weems states in the February 12, 2008 email that "Macquarie would gladly fund for Lexmac the

bonus requirement for re-leasing acreage that secures our loan," but the record is devoid of any

evidence that the parties discussed the maximum dollar amount that the Plaintiffs were willing to

spend on the bonuses or the terms and royalties of the new leases.[14]  See Docket No. 26-9.  The

---

[14] "The 'essential terms' of an oil and gas lease have been rather vaguely defined as 'the term for which the lease was to run, the time for the beginning of drilling operations, the amount of royalty to be paid for oil, the amount of royalty to be paid for gas, and other essential provisions . . . .'" Lohse, 389 N.W.2d at 355 (quoting

Plaintiffs state that "[t]he relevant promise was that Knickel would take the necessary steps to either extend or renew the existing leases," but the Plaintiffs had a direct interest in the terms Knickel was to negotiate with the landowners. <u>See</u> Docket No. 114. It is unreasonable to expect that the Plaintiffs promised to pay the bonuses of the renewed leases without setting limitations as to the dollar amounts of the bonuses and the terms and royalties of the renewed leases. Accordingly, the Court finds that the Plaintiffs have not established a genuine issue of material fact of a clear, definite, and unambiguous promise.

Even if the Plaintiffs had established a clear, definite, and unambiguous promise, the Plaintiffs have not provided facts sufficient to establish a substantial change in their position due to forbearance. It is undisputed that on February 13, 2008, the McKenzie County District Court entered a judgment against LexMac and Novus in the amount of $5,296,252.29 plus interest accruing from and after October 18, 2007, at the contract rate. <u>See</u> Docket No. 26-7. On April 7, 2008, Macquarie Barnett, at a sheriff's sale, bid $5,400,000 on LexMac's and Novus's rights, title, and interest in the leases that formed the original collateral. Since many of the leases had already expired, Macquarie Barnett foreclosed on only seven of the nineteen leases. <u>See</u> Docket No. 101-6.

Macquarie Barnett was fully aware when placing this bid that only seven of the leases were being foreclosed on, and did not have an independent valuation done on the expired leases to determine their worth:

| Q. [Counsel for the Defendants]: | Sir, that's not my question. Did the bank take any steps or not to value the leases independently of each other? |
|---|---|
| [Counsel for the Plaintiffs]: | Object to form. |

---

Maxwell, <u>Enforceability of Oral Agreements in Oil and Gas Transactions</u>, 7 Inst. on Oil & Gas L. & Tax'n 165, 173 (1956)).

|  |  |
|---|---|
| A. [Michael Sextro]: | The leases are not valued independently. They are valued based off the Sproule report and based on what happens if you invest. You can then – I mean, there's obviously a different value within the industry. |
| Q. [Counsel for the Defendants]: | Have you seen any internal bank documents that place an independent value, or attempts to, on each one of the separate leases? |
| A. [Michael Sextro]: | No, I have not. |

See Docket No. 52-2, p. 52.  Without an independent valuation of the leases, the Court is unable to find that the Plaintiffs suffered a substantial change in their position by bidding $5,400,000 for the foreclosed property when the original judgment was in the amount of $5,296,252.29 plus interest. The Court finds that the Plaintiffs have failed to raise a genuine issue of material fact of promissory estoppel.  Summary judgment is granted in favor of the Defendants and Counter-Claimants on this claim.

### 4)   PIERCING THE CORPORATE VEIL

The Plaintiffs contend that LexMac, Novus, and Lexar are the alter egos of Knickel, and request the Court to pierce their corporate veils.  The Plaintiffs contend that "[Knickel] has used these companies to perpetuate and hide his fraudulent scheme to misappropriate property that rightfully belongs to Macquarie."  See Docket No. 78.

"Although the officers and directors of a corporation generally are not liable for the ordinary debts of a corporation, the corporate veil may be pierced when the legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime."  Coughlin Constr., 755 N.W.2d at 873 (citing Axtmann v. Chillemi, 740 N.W.2d 838, 843 (N.D. 2007); Intercept Corp. v. Calima Fin.,

68

LLC, 741 N.W.2d 209, 213 (N.D. 2007)).  A number of factors are considered when determining whether to pierce the corporate veil:

> insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings.

Axtmann, 740 N.W.2d at 843.  "'[A]n element of injustice, inequity or fundamental unfairness must be present before a court may properly pierce the corporate veil.'"  Intercept Corp., 741 N.W.2d at 213 (quoting Jablonsky, 377 N.W.2d at 564).  The burden of establishing a basis for piercing the corporate veil rests on the moving party and the resolution of the issue is "'heavily fact-specific'" and "'peculiarly within the province of the trial court.'"  Axtmann, 740 N.W.2d at 844 (quoting Jablonsky, 377 N.W.2d at 565).

The Plaintiffs contend that they "have offered evidence that Knickel fraudulently told MBL that he would extend or renew all of the expiring leases.  Knickel used these fraudulent statements as a cover for his scheme to remove certain property owned by two of his companies, LexMac and Novus, and place these properties with another one of his companies, Lexar."  See Docket No. 114. The Court has determined that the Plaintiffs have failed to provide sufficient facts to establish a genuine issue of material fact of either fraud or deceit.

The record is devoid of any evidence that LexMac, Novus, and Lexar were undercapitalized; that LexMac, Novus, and Lexar failed to observe corporate formalities, failed to pay dividends, or were insolvent; that Knickel siphoned funds from the companies; that the officers and directors of LexMac, Novus, and Lexar were nonfunctioning; of the absence of corporate records; and that LexMac, Novus, and Lexar existed as merely a facade for Knickel's individual dealings.  More

important, the Plaintiffs have failed to provide any evidence that it would be unjust, inequitable, or fundamentally unfair to not hold Knickel personally liable for the conduct of LexMac, Novus, and Lexar.  The Court finds that the Plaintiffs have failed to provide sufficient evidence to pierce the corporate veils of LexMac, Novus, and Lexar.  Summary judgment is granted in favor of the Defendants and Counter-Claimants on this claim.


IV.     **CONCLUSION**

The Court **GRANTS IN PART AND DENIES IN PART** the Plaintiffs' and Third-Party Defendant's "Motion for Partial Summary Judgment on Plaintiffs' Breach of Contract Claim and Motion for Summary Judgment on Defendants' Counter-Claims" (Docket No. 99).  Specifically, the Court grants the Plaintiffs' and Third-Party Defendant's motion for summary judgment concerning the request to quiet title and remove the lis pendens, and the claims of tortious interference (as to filing the lis pendens, top leasing Lexar's acreage, and threatening landowners with liens) and unfair lending practices and lender liability.  The Court denies the Plaintiffs' and Third-Party Defendant's motion for summary judgment as to the breach of contract claim, the declaratory judgment action, the claims of misappropriation and misuse of confidential and proprietary information, tortious interference (as to acquiring leases), alter ego, conspiracy, and breach of the duty of good faith and fair dealing.

The Court **GRANTS IN PART AND DENIES IN PART** the Defendants' and Counter-Claimants' motion for summary judgment (Docket No. 104).  Specifically, the Court grants the Defendants' and Counter-Claimants' motion for summary judgment as to the Plaintiffs' claims <u>and</u>

as to the declaratory judgment action.  The Court denies the Defendants' and Counter-Claimants'
motion for summary judgment as to their request to quiet title and remove the lis pendens.

The Court declares that LexMac Energy, L.P. and Novus Operating Company, L.P. did not
have a duty under either the Senior First Lien Secured Credit Agreement or the Mortgage,
Assignment of Production, Security Agreement and Financing Statement to obtain new leases  when
the collateral leases expired in accordance with their own terms.

**IT IS SO ORDERED.**

Dated this 30th day of June, 2010.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court