**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Lexar Energy, Inc.; Novus Operating Company, LP; and LexMac Energy, L.P., | ) ) ) | |
| Counter Claimants and Third-Party Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | **ORDER** |
| Macquarie Bank Limited, | ) ) | Case No. 4:08-cv-048 |
| Counter Defendant, | ) ) | |
| and | ) ) | |
| Macquarie Barnett LLC, | ) ) | |
| Third-Party Defendant. | ) | |

_____

Before the Court is the Counter Claimants and Third-Party Plaintiffs' (collectively "Lexar")

"Motion to Determine Admissibility of Damages Testimony, and in the Alternative, Motion for

Leave to Designate Non-Retained Testifying Experts," filed on August 20, 2010.  See Docket No.

148.  The counter defendant, Macquarie Bank Limited, and third-party defendant, Macquarie Barnett,

LLC (collectively "Macquarie") filed a "Motion for Further Summary Judgment Ruling" and their

response in opposition to Lexar's motion on September 13, 2010.  See Docket Nos. 152 and 156.

On October 4, 2010, Lexar filed a response and a motion to strike Macquarie's motion.  See Docket

Nos. 159 and 166.  Macquarie filed a reply brief in support of its motion and a response in opposition

to Lexar's motion to strike on October 21, 2010.  See Docket Nos. 161 and 167.  Oral argument on

the motions was held in Bismarck, North Dakota on December 6, 2010.  For the reasons set forth

below, the Court grants in part and denies in part Lexar's "Motion to Determine Admissibility of

Damages Testimony, and in the Alternative, Motion for Leave to Designate Non-Retained Testifying

Experts," denies Macquarie's "Motion for Further Summary Judgment Ruling," and denies Lexar's motion to strike.

## I.   <u>BACKGROUND</u>

Macquarie Bank Limited, an Australian Bank doing business in the United States through Macquarie Americas Corp., provided funding to LexMac Energy, L.P. ("LexMac") and Novus Operating Company, L.P. ("Novus") to develop oil and gas leases in McKenzie County, North Dakota in what became known as the "Cedar Butte Project."  In 2005, Macquarie Bank agreed to loan LexMac and Novus up to $20,000,000 for the project, with LexMac's and Novus's oil and gas leases serving as collateral.  Problems arose and Macquarie Bank stopped funding the project.

On July 31, 2007, Macquarie Bank issued a "Notice of Default and Notice of Intent to Accelerate."  <u>See</u> Docket No. 1-7.  On October 22, 2007, Macquarie Bank filed a complaint in McKenzie County District Court to foreclose on LexMac's and Novus's rights, title, and interest in real property pursuant to the oil and gas leases that were pledged as collateral.  <u>See</u> Docket No. 1-8. LexMac and Novus took efforts to renew leases that could be renewed, but Lexar Energy, Inc. ("Lexar") signed new leases with landowners whose leases with LexMac and Novus had expired. On April 7, 2008, a sheriff's sale was held at the McKenzie County Courthouse and Macquarie Barnett, a wholly-owned subsidiary of Macquarie Bank, purchased LexMac's and Novus's rights, title, and interest in the original collateral, for the sum of $5,400,000.  <u>See</u> Docket No. 101-7. LexMac's and Novus's interest had already expired in a majority of the leases that formed the original collateral.  Macquarie Bank filed a "Notice of Lis Pendens," dated May 27, 2008, with the McKenzie County Recorder asserting, "The action involves the title to and/or seeks to enforce a lien,

2

charge or encumbrance against Lexar Energy, Inc.'s interest, as lessee" in a number of the leases owned by Lexar. See Docket No. 75-2. Folllowing the filing of the lis pendens, Macquarie Barnett top leased[1] the acreage leased by Lexar. Then, Macquarie Barnett filed an amended lis pendens that did not list Lexar's leases, but did reference the expired leases.

Macquarie Bank and Macquarie Barnett were the original plaintiffs in this action. They filed their complaint in McKenzie County state district court on March 31, 2008. See Docket No. 1-3. The case was removed to federal district court on April 30, 2008. See Docket No. 1. The Plaintiffs' second amended complaint included claims of fraud, conversion, promissory estoppel, breach of the conveyance, and piercing the corporate veil. See Docket No. 78. Lexar filed an amended counterclaim that included claims for declaratory judgment, to quiet title and remove the lis pendens, misappropriation and misuse of confidential and proprietary information, tortious interference, conspiracy, breach of duty of good faith and fair dealing, alter-ego, and unfair lending practices and lender liability. See Docket No. 75. All parties filed motions for summary judgment. See Docket Nos. 99 and 104. After the Court's Order of June 30, 2010, the only claims remaining are Lexar's claims for misappropriation and misuse of confidential and proprietary information, conspiracy, breach of duty of good faith and fair dealing, and alter-ego. See Docket No. 137.

Each of the remaining claims is premised on Macquarie's alleged misappropriation and misuse of confidential and proprietary information. Lexar asserts it presented confidential and proprietary information including, but not limited to, "land production maps, seismic data and interpretations, structure and isoporosity maps, log displays, petrophysical reports, reserve

---

[1]  The term "top lease" is defined as "[a] lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated." Nantt v. Puckett Energy Co., 382 N.W.2d 655, 657 n.1 (N.D. 1986) (quoting Norman Jessen & Assocs. v. Amoco Prod. Co., 305 N.W.2d 648, 649 n.2 (N.D. 1981)).

projections, well histories, casing designs, and log evaluations" and "various expert analyses and interpretations of this data" to Macquarie Bank "for the express purpose of facilitating the lending of money for drilling and operations." See Docket No. 75, p. 4.  They contend Macquarie Bank then created Macquarie Barnett for the sole purpose of acquiring and developing oil and gas leases in the Cedar Butte Project area using the confidential and proprietary information it obtained from Lexar.

On August 20, 2010, Lexar filed a "Motion to Determine Admissibility of Damages Testimony, and in the Alternative, Motion for Leave to Designate Non-Retained Testifying Experts." See Docket No. 148.  Lexar requests that the Court determine whether Bradley D. Knickel will be allowed to testify as a lay witness  regarding damages and rely on a report prepared by Sproule Associates Inc. ("the Sproule Report").  Lexar requests that the Sproule Report be admitted into evidence.  In the alternative, Lexar requests that the Court allow it to designate Knickel as an expert witness.  On September 13, 2010, Macquarie filed a "Motion for Further Summary Judgment Ruling" and a response to Lexar's motion.  See Docket Nos. 152 and 156.  Macquarie contends Lexar cannot prove any damages related to their remaining claims and  requests that the Court dismiss Lexar's claims.  On October 4, 2010, Lexar filed a response and moved to strike Macquarie's "Motion for Further Summary Judgment Ruling" because it was filed after the deadline for dispositive motions.  See Docket Nos. 159 and 166.

## II.   LEGAL DISCUSSION

### A.   TESTIMONY OF BRADLEY KNICKEL

Lexar requests that the Court allow Bradley Knickel to offer lay opinion testimony concerning the damages sustained in this case.  Rule 701 of the Federal Rules of Evidence provides for opinion testimony by a lay witness:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"A witness may provide lay opinion testimony 'about facts within his or her range of generalized knowledge, experience, and perception.'" US Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 690 (8th Cir. 2009) (quoting United States v. Espino, 317 F.3d 788, 797 (8th Cir. 2003)).  "While the ordinary rule confines the testimony of a lay witness to concrete facts within his knowledge or observation, the court may rightly exercise a certain amount of latitude in permitting a witness to state his conclusions based upon common knowledge or experience." Espino, 317 F.3d at 797 (quoting United States v. Oliver, 908 F.2d 260, 264 (8th Cir. 1990)).  "Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." United States v. Peoples, 250 F.3d 630, 641 (8th Cir. 2001).  However, the Advisory Committee's notes to Rule 701 provide:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.  See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business).  Such opinion

testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

In Allied Sys. Ltd. v. Teamsters Auto. Transp. Chauffeurs, Demonstrators & Helpers, Local 604, 304 F.3d 785 (8th Cir. 2002), the Teamsters argued Allied's Vice President of Internal Audit should not have been allowed to offer his lay opinion regarding damages because his opinion was based on specialized knowledge and he was not disclosed as an expert. Allied, 304 F.3d at 792. The Eighth Circuit Court of Appeals held it was not an abuse of discretion to allow the vice president's testimony. Id. The Court explained:

> [The vice president's] testimony was limited to his firsthand knowledge, obtained as the bookkeeper and record-keeper at the Wentzville terminal and from a field audit he conducted within weeks of the first work stoppage. "Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience is a sufficient foundation for lay opinion testimony." Burlington N. R.R. Co. v. Nebraska, 802 F.2d 994, 1004-05 (8th Cir. 1986).

Id.

In this case, Bradley Knickel has a 92-percent limited partnership interest in LexMac, a 99-percent limited partnership interest in Novus, and he fully owns Lexar. See Docket No. 57-4, pp. 3, 5. The record reveals that Knickel was involved in the day-to-day operations of all three companies. As long as a proper foundation is laid, the Court finds that Knickel is in a position to offer his lay opinions as to damages. This testimony will be allowed "not because of [Knickel's] experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that [Knickel] has by virtue of his . . . position in the business." Fed. R. Evid. 701 advisory committee's notes. Knickel's knowledge regarding the oil industry may not be in the purview of the average lay person, but "perceptions based on industry experience is a sufficient

6

foundation for lay opinion testimony." <u>Allied</u>, 304 F.3d at 792 (quoting <u>Burlington</u>, 802 F.2d at 1004-05).

The Court finds that Bradley Knickel can offer lay opinion testimony regarding damages. Such testimony is based on Knickel's perceptions related to his experience in the development of oil and gas leases and properties in western North Dakota. In light of the remaining claims, the Court would note that the recoverable damages in this case will, as a general rule, be the amount of monies, if any, the Plaintiffs were unjustly enriched or unjustly gained from their actions, and any other actual losses sustained by the Defendants. The anticipated value of the reserves, the expected profits to be gained, or the anticipated value of the oil and gas leases are, in the opinion of the Court, too remote, uncertain, and speculative to warrant recovery. The accepted approach is to measure the value of the benefits, profits, or advantages gained by the Plaintiffs (Macquarie Bank/Macquarie Barnett) as a result of the misappropriation and misuse of confidential and proprietary information. Damages will not be allowed or assessed based on speculative expectations of profit.

### B.   THE SPROULE REPORT

Lexar requests that Knickel be allowed to rely on the Sproule Report in his testimony. The Sproule Report was issued in March 2004. The report was based on closing prices as of December 31, 2003. The Advisory Committee's notes to Rule 701 cite <u>Lightning Lube</u>, in which a business owner was allowed to offer his lay opinion regarding projected lost profits, relying on a report that he participated in making, but was prepared by an accountant. <u>Lightning Lube</u>, 4 F.3d at 1175. The Third Circuit Court of Appeals <u>Lightning Lube</u> explained:

> [G]iven [the business owner's] knowledge and participation in the day-to-day affairs
> of his business, his partial reliance on the report, even if prepared by an outsider, does

not render his testimony beyond the scope of Rule 701. As the district court correctly noted, "it is logical that in preparing a damages report the author may incorporate documents that were prepared by others, while still possessing the requisite personal knowledge or foundation to render his lay opinion admissible under Fed. R. Evid. 701." Lightning Lube, Inc. v. Witco, 802 F. Supp. [1180,] 1193 [(D.N.J. 1992).]

Id. Knickel testified in a deposition that Sproule Associates Inc. prepared the Sproule Report at his request on behalf of Lexar. See Docket No. 57-4, p. 12. Knickel's reliance on the Sproule Report in his testimony "does not render his testimony beyond the scope of Rule 701." Lightning Lube, 4 F.3d at 1175.

Lexar also seeks to admit the Sproule Report into evidence as the statement of a party opponent. Macquarie contends the Sproule Report is inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is not admissible. Fed. R. Evid. 802. Rule 801(d)(2) provides that a statement is not hearsay if:

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. . . .

The Advisory Committee's notes explain, "Under established principles an admission may be made by adopting or acquiescing in the statements of another. . . . Adoption or acquiescence may be manifested in any appropriate manner. . . . The decision in each case calls for an evaluation in terms of probable human behavior. . . ." Fed. R. Evid. 80 Advisory Committee's notes.

8

The United States District Court for the Northern District of Iowa has discussed the applicability of Rule 801(d)(2)(B) in civil cases, considering the Eighth Circuit Court of Appeals' interpretation of the rule in criminal cases:

> In the criminal context, at least, the Eighth Circuit Court of Appeals has found that a statement is admissible as an adoptive admission under Rule 801(d)(2)(B), if the party against whom it was offered was present when the statement was made, understood it, and had the opportunity to deny it. See, e.g., United States v. Kehoe, 310 F.3d 579, 591 (8th Cir. 2002). These requirements do not translate well to the context of survey evidence, however. The Fifth Circuit Court of Appeals found that "damage survey reports" were admissible where the party against whom they were offered met with the representative preparing the survey reports several times while he was preparing the reports and never objected to them. United States v. Central Gulf Lines, Inc., 974 F.2d 621, 628 (5th Cir. 1992). . . . [I]t seems likely that a "manifestation" of adoption or belief in the truth of survey evidence, as required by Rule 801(d)(2)(B), could be found from knowledge of the contents of the survey, failure to object to it, and use of the survey results in a manner suggesting that the user believed the results to be reliable.

Bodeans Cone Co., L.L.C. v. Norse Dairy Sys., L.L.C., 678 F. Supp. 2d 883, 905 (N.D. Iowa 2009). The District Court for the Western District of Missouri has noted, "There is no doubt that where a party's use of a document supplied by another in fact represents the party's intended assertion of the truth of the information therein, an adoptive admission can be found." White Indus., Inc. v. Cessna Aircraft Co., 611 F. Supp. 1049, 1062 (W.D. Mo. 1985) (citing IV Wigmore on Evidence § 1073, at 138-40 (Chadbourn ed. 1972); McCormick on Evidence, 649-51 (2d ed. 1972)).

The record reveals that Macquarie had direct knowledge of the contents of the Sproule Report and used the report in a manner indicating they believed it to be reliable. Michael Sextro, senior vice-president of administration and investment compliance for Macquarie Bank, testified in a deposition regarding Macqurie's use of the Sproule Report in its request for damages:

> Q.      . . . How much in damages is the bank seeking from this lawsuit, sir?

       A.    I'm not sure – I mean, there were a lot of factors that – that play into – into that.  The general – the way that we have looked at those damages is, one, we have – we've reviewed the report that I think you supplied earlier, <u>the Sproule report, which basically laid out a value that was within there</u> – within that report that Brad [Knickel] provided to Macquarie when he first came to the company for the loan, less the amount that we basically paid for the – at the foreclosure sale, plus the dollars that we have invested to acquire the top leases, and then plus any attorney fees.

            And again, all of that – I mean, that's the methodology in determining it, but there's not –

       Q.    Do you have a number to date what that is?

       A.    I mean, if you were to take, as I said, take those reports, you know, situations change, it can move.  But you've got forty – roughly, what?  <u>47 million in the Sproule report</u>, less the roughly 5 or 6 million of the – for the Ann or the foreclosure, which gets you down to 41; about another million in top-leasing, which takes it back to 42; and then whatever attorney fees are.  So, you know, a rough guess, you know, 42, $43 million – or 42 million probably. . . .

<u>See</u> Docket No. 59-2, pp. 18-19 (emphasis added).  Sextro also testified with regard to Macquarie Bank's reliance on the Sproule Report for a value of the leases to be pledged as collateral for the loan:

       Q.    Is it fair to say that the bank was looking to the – to the value of the leases to support the collateral, to support the credit?

    . . . .

       A.    The leases were strictly a contribution.  And as you pointed out previously, <u>the value was the 47 million that Sproule had laid out</u>.

<u>See</u> Docket No. 59-2, p. 28 (emphasis added).  Sextro testified that Macquarie Bank did not value the leases itself but relied on the Sproule Report:

       Q.    . . . Did the bank take any steps or not to value the leases independently of each other?

    . . . .

> A.     The leases are not valued independently.  <u>They are valued based off the Sproule report</u> and based on what happens if you invest.  You can then – I mean, there's obviously a different value within the industry.

<u>See</u> Docket No. 59-2, p. 52 (emphasis added).

If all of Lexars' (Lexar Energy, Novus Operating, and LexMac Energy) claims had survived summary judgment, the Court may have allowed the "Sproule Report" into evidence at trial. However, as a result of the Court's Order of June 30, 2010, the only surviving claims are essentially premised on Macquarie's alleged misappropriation and misuse of confidential and proprietary information.  As previously noted, the anticipated values of the reserves, the expected profits to be gained, or the anticipated value of the oil and gas leases, are not an element of recoverable damages in this litigation as it currently stands.  The Court further finds that anticipated profit or expectations of profit, or the anticipated values of the reserves or the oil and gas leases, are damages which are too remote, uncertain, and speculative to warrant recovery in this case , particularly when one considers the causes of action that survived summary judgment.  Simply stated, the recoverable damages for the claims which remain in this litigation are essentially damages for unjust enrichment, or for the value of the benefits, profits, or advantages gained by Macquarie as a result of any misappropriation and misuse of confidential and proprietary information.  Recoverable damages may also include any actual losses sustained by the injured party or parties.

### C.     <u>MOTION FOR FURTHER SUMMARY JUDGMENT RULING</u>

The Court notes the deadline to file dispositive motions was on October 1, 2009.  <u>See</u> Docket No. 70.  Macquarie's "Motion for Further Summary Judgment Ruling" was filed after that deadline. Lexar requests that the Court refuse to hear Macquarie's motion.  The Court has "broad discretion

to manage [its] docket[] and address particular circumstances" with regard to summary judgment motions. Huggins v. FedEx Ground Package Sys., 592 F.3d 853, 856 (8th Cir. 2010) (citing Sipe v. Workhorse Custom Chassis, LLC, 572 F.3d 525, 531-32 (8th Cir. 2009); Reasonover v. St. Louis Cnty., Mo., 447 F.3d 569, 579 (8th Cir. 2006)). Macquarie contends it could not have made the arguments it makes in its motion prior to the Court's summary judgment order of June 30, 2010. See Docket No. 137. Macquarie states in its memorandum, "Simply stated, the Court's Order changed the landscape of this case, and Macquarie has done nothing more than bring additional facts–namely, the nature of relief sought by Defendants–to the Court's attention in light of the new landscape." See Docket No. 161. The Court agrees that the landscape of the case has changed since its Order on June 30, 2010. Accordingly, the Court denies Lexar's motion to strike and will consider Macquarie's motion on the merits.

Macquarie's "Motion for Further Summary Judgment Ruling" is premised on the contention that Lexar cannot prove any damages related to its remaining claims. That premise is rejected. The recoverable damages in a case of this nature are generally the amount of monies, if any, Macquarie unjustly gained or benefitted from its actions and any other actual losses sustained by the Defendants. As previously noted, the anticipated values of the reserves, the expected profits to be gained, or the anticipated value of the oil and gas leases, are too remote, uncertain, and speculative to warrant recovery. Whether Macquarie Bank and/or Macquarie Barnett are liable under the legal theories which remain, and  whether they were unjustly enriched, are factual issues which the jury will need to resolve at trial. Accordingly, Macquarie's "Motion for Further Summary Judgment Ruling" is denied.

III.    <u>**CONCLUSION**</u>

The Court has carefully considered the parties' briefs, the entire record, and relevant case law. The Court **GRANTS IN PART AND DENIES IN PART** the Counter Claimants and Third-Party Plaintiffs' "Motion to Determine Admissibility of Damages Testimony, and in the Alternative, Motion for Leave to Designate Non-Retained Testifying Experts" (Docket No. 148). The Court finds that Bradley Knickel will be allowed to offer lay opinion testimony regarding the subject of damages, but such testimony will be limited to relevant evidence concerning the damages which are recoverable in this case. As the Court previously indicated, the Lexar Defendants will be allowed to conduct limited discovery related to the sale of the properties and leases in March 2010, and discovery concerning whether Macquarie Bank and/or Macquarie Barnett received any benefit or were unjustly enriched as a result of the sale. This necessarily includes discovery concerning details surrounding Macquarie's efforts to sell the properties and leases, and whether such efforts were conducted in good faith and in accordance with sound business practices, and reflect what a willing buyer would have paid a willing seller. All such discovery shall be completed by January 31, 2011, unless the parties mutually agree to a different time frame or the Court is convinced that the time period to conduct such discovery needs to be extended. The Court **DENIES** the Counter Defendant and Third-Party Defendant's "Motion for Further Summary Judgment Ruling" (Docket No. 152) and the Counter Claimants and Third-Party Plaintiffs' "Motion to Strike" (Docket No. 166).

**IT IS SO ORDERED.**

Dated this 17th day of December, 2010.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

13